244 A.2d 871.

SPOUTING ROCK BEACH ASSOCIATION *vs.*
RAYMOND P. GARCIA *et al.*

AUGUST 8, 1968.

PRESENT: Roberts, C. J., Paolino, Powers, Joslin and Kelleher, JJ.

KELLEHER, J. This is a civil complaint[1] which was brought to enjoin the defendant Garcia, as the director of public works of the city of Newport, from carrying out an order given him by the other defendants, who are members of the Newport city council, to remove a chain link fence and shrubs maintained by the plaintiff across Bellevue Avenue, a public highway, and to clear the street for a width of 50 feet to the shore which lies some distance beyond the fence. A superior court justice heard the case and entered judgment for the defendants. The plaintiff has appealed this action to us.

The plaintiff is a Rhode Island corporation created by a special act of the general assembly on February 5, 1897. It owns a parcel of land bordering on the Atlantic Ocean and located in the southeast section of Newport. On this parcel plaintiff operates a club which provides bathing and other allied services for the sole and exclusive use of its members and their guests. This enterprise is a well-known resort, usually referred to as Bailey's Beach. On a warm summer's day if a person travels in a westerly direction on Bellevue Avenue towards Bailey's Beach, his forward progress is blocked by the fence and shrubs which are the subject of this suit. A motorist who did not wish to stop at the fence and observe the bathers cavorting on the beach sands or in the surf must turn to his right from Bellevue Avenue onto Coggeshall Avenue for a short distance and then left onto Ocean Drive, proceeding as he goes in a

---

[1] This litigation was commenced in June, 1965 by the plaintiff's filing of a bill in equity. A hearing on bill, answer and proof was held in July, 1967—long after January 10, 1966, the effective date of the superior court's new rules of civil procedure. We have, therefore, used the terminology of the new rules throughout this opinion.

somewhat semi-circular direction past the entrance to the club which is located on the Drive.

The controlling issue to be determined in this appeal is the legal location of the western terminus of Bellevue Avenue. Is it, as plaintiff argues, at the fence it has erected or perhaps at some point further westward but short of the ocean's mean highwater mark, or does Bellevue Avenue in a legalistic sense extend, as the trial justice found, to the shore of the Atlantic Ocean? The answer lies in a studied analysis of the record of proceedings of the Newport "town" council during the year 1852 and certain conveyances made by plaintiff's predecessors in title, having in mind our long-established principle that findings of fact made by a trial justice will be accorded great weight and his decision will not be disturbed unless clearly wrong.

The narrative set forth below is based upon copies of the official records of various proceedings of the Newport "town" council during the year 1852. The original records had been made available to counsel for both parties. Prior to the time of the hearing in the superior court, the records were misplaced. However, a photostatic copy of the pertinent portions of the minutes of the council concerning the 1852 extension of Bellevue Avenue was introduced without objection into evidence. In 1852 Newport was a town and Bellevue Avenue was Bellevue Street and Dixon Street was Dixon's Lane. In the narrative, we shall call the municipality a town and refer to the two highways by their earlier designation.

The Newport town council met on Monday, January 5, 1852, at 6:30 p.m. After approving the payment of $3 to John W. Davis for his services in decorating the state house in preparation for a reception given the President of the United States during the preceding summer, the council received a petition from a number of citizens of the town and others who owned lands in Coggeshalls Neck from the

"ocean" on the south to the southern termination of Bellevue Street. The petitioners asked that a highway 50 feet in width be laid out and opened from the southern terminanation of Bellevue Street extending southerly to the land of one of the petitioners, Mary L. Ruggles, and then extending southerly and southwesterly in accordance with a plat attached to the petition to a southern termination located "* * * at the East end of the Beach called the West Beach of the Bailey farm." The petition alleged that a continuation of Bellevue Street to some point on or near the ocean was needed for the greater extension and prosperity of the town and for the accommodation of those who are about to build residences in that area. In furtherance of these objectives, it was stated that the petitioners had already laid out a portion of the desired highway from the ocean to the land of Mary L. Ruggles and that if the council accepted the highway as shown on the plat which was annexed to their petition[2] the petitioners at their own expense would lay out, fence in and put in suitable condition this part of the road.

The council accepted the petition and after consideration thereof determined that the public convenience required that a highway 50 feet wide should be laid out and opened from the southern termination of Bellevue Street at the north side of Dixon's Lane and ending at or near the east end of the Beach called the West Beach of the Bailey farm. Thereupon three disinterested commissioners were appointed to establish the highway in accordance with the council's order and to agree with the owners for the damages they might sustain by means of the highway passing through their land. The commissioners were charged to mark out the road in such a manner as would be most advantageous

---

[2]At the trial the whereabouts of the petition and the accompanying plat were unknown. They were not introduced as exhibits and consequently they are not part of the record.

to the public and "* * * as little as may be to the injury of the owners * * *." The council directed a justice of the peace and a town constable to accompany the commissioners as they carried out their task.

On April 10, 1852, the commissioners were sworn to the faithful performance of their duties. In their report to the council dated May 6, 1852, the commissioners stated that on April 26, 1852, they had proceeded to the southern terminus of Bellevue Street on the north side of Dixon's Lane and "thence surveyed bounded and marked out a highway from said Southern terminus of East Touro or Bellevue Street, to the West Beach on the Baily [sic] farm so called, in Coggeshalls Neck, so called, in said Newport, viz. from said Southern terminus * * * to the Shore * * *." Attached to the report was an exact plan of the highway as surveyed, bounded and marked out by the commissioners. A copy of the plan is an exhibit.

Upon being notified of the filing of the commissioners' report, the council ordered all affected resident landowners to be summoned before it on June 7, 1852 to be heard for or against the reception of the report. Out-of-state owners were to be notified by an advertisement appearing in a local newspaper.

On June 7, 1852, the council held a public hearing on the commissioners' report. Some of the landowners appeared and were "* * * heard, at full length * * *." Among those present at the hearing were Joseph I. Bailey and Alfred Smith, the then owners of plaintiff's real estate. The report of the commissioners was received and approved. The council ordered that it be recorded and "* * * said highway established and laid open, by removing all buildings, fences, and other impediments therein, and that a warrant issue to Robert Seatle, Town Sergeant of this town for that purpose." There is no evidence that either Bailey or Smith protested the acceptance of the commissioners'

report or that they claimed the west end of the new road was on their property and not a highway.

The plaintiff in urging that the trial justice erred in holding that Bellevue Street runs to the ocean's shore points to the numerous times the word "beach" appears in the council's records. This being so it argues the highway ended at the beach as that word is defined in *Waldman* v. *Town of Barrington,* 102 R. I. 14, 227 A.2d 592.

In the *Waldman* case we pointed out the difference between the word "beach" when used in a legal sense and the word "shore" as used in a constitutional sense.[3] We held that when the term "beach" is used in a legal context that bears on property rights, it will be held to apply to that portion of land which lies between the high-water mark and the beginning of the upland. The "shore," when used in a constitutional sense we said, describes the land which lies between the high- and low-water lines. It was not our intent to give a rigidity of definition to these two terms so that any reference to one would automatically exclude consideration of the other. In our opinion, plaintiff's reliance on *Waldman* to assist it here is unwarranted. The legal context to which we referred in *Waldman* had a degree of specificity which is lacking here.

A major factor in *Waldman* was the testimony of the surveyor who, after examining certain deeds, stated that the southerly line of the plaintiffs' land coincided with a line of granite bounds and hedge which were located on the northerly inshore line of the Barrington beach. We took pains to point out that all the deeds examined by the surveyor contained metes and bounds descriptions. In the instant case the council's minutes are not drawn nor should

[3]Article I, sec. 17, of the Rhode Island constitution provides "The people shall continue to enjoy and freely exercise all the rights of fishery, and the privileges of the shore, to which they have been heretofore entitled * * *" at the time the constitution was adopted in 1843.

we expect them to be shown with the accuracy one looks for when we consider the contents of a deed.

We recognize that there will be instances where some person will use the terms "beach" and "shore" without any conscious regard to the legal distinctions to be drawn between the two. As an apt illustration of this tendency we have only to look at *Town of New Shoreham* v. *Ball*, 14 R. I. 566, where this court said "In this State the beaches belong to the State and cannot be let by the towns." It would appear that back in 1884 even this court used "beach" synonymously with "shore."

As pointed out by the trial justice, the reference of the word "beach" as it appears in various portions of the council records was anything but precise. Several times we find the expression "* * * at the East end of the Beach called the West Beach." At another time, the minutes refer to "the West Beach." Again we see "* * * ending at, or near the East end of the Beach, called the West Beach * * *." The council directed the town sergeant to open the road "* * * to the West Beach on the Bailey farm agreeably to the report of the Committee." The records also described the new highway as "the highway to Coggeshalls Neck" or "the highway into Coggeshalls Neck."

The commissioners' report, however, refers to "beach" only in its introduction where it is stated that they had gone to the south end of Bellevue Street and then surveyed, bounded and marked a highway "to the West Beach." This sole reference by the commissioners to the beach was followed by a videlicit which set forth an exact description of the survey the commissioners actually made. The report sets forth the seven lengths of the new highway together with the seven precise courses which were drawn on the plan accompanying the report. The first five of the courses, consisting of a varying number of feet in each course, all run in a general southwesterly direction from the southern

end of Bellevue Avenue for a total distance of 7,958 feet. The last two courses entitled "F to G" and "G to H" run in a general northwesterly direction. F to G reads "N 72° 44′ W. Six hundred feet on the South side of the road," and the last course G to H reads "N 73° 30′ W. to the Shore." The last course, as one can see, runs unmeasured to the shore.

The trial justice in an extensive and comprehensive review of the evidence found that the varying references to the word "beach" in the council's minutes described a point along the shore where the road was to end. It was, the court said, a lateral rather than a longitudinal point of reference. In finding that Bellevue Avenue ended at the Atlantic Ocean, the trial justice placed strong emphasis on the fact that the commissioners ran the last course in their survey (G to H) unmeasured to the shore. He praised the officials for not measuring any specific distance for the last course. It indicated to the court that the commissioners were aware that the ocean's roll together with the storms which would surely follow could change by the processes of accretion, avulsion or erosion the precise location of the shore.

The superior court also observed that in running the last course to the shore the commissioners were complying with the petitioners' request that the road be opened from the "ocean" to the then southern end of Bellevue Avenue. A surveyor who testified for plaintiff conceded that even according to his calculations point "H" was 100 feet to the west of the fence and shrubs but still short of the mean high-water line. He reached this conclusion by scaling the distance of the course "G to H" as it appears on the plat. The trial justice expressly rejected this testimony because of his conclusion that point "H" was not intended to represent any specific distance from point "G."

As further evidence that Bailey and Smith were aware

that Bellevue Avenue ran to the ocean's shore, the trial justice pointed to two deeds wherein title to Bailey's Beach was vested in plaintiff.

On October 15, 1896, the heirs of Joseph I. Bailey and Alfred Smith conveyed to certain trustees of plaintiff a parcel of land upon which is located Bailey's Beach. The description in that deed stated that the land was bounded "* * * Northerly on Ocean Avenue Easterly on Coggeshall Avenue and on the Train Villa Estate, so called, according to the line shown on the Map hereinafter mentioned, Southerly in part on Bellevue Avenue and mostly on the Atlantic Ocean and Westerly on land of Henry Clews * * *." On July 29, 1897, the trustees conveyed the property to plaintiff. The description in their deed, however, differed from the conveyance they received from the heirs in that the easterly boundary of the parcel was described as "* * * Easterly, partly on Coggeshall Avenue *partly* on the *end* of Bellevue Avenue and partly on the 'Train Villa Estate' * * *." (italics ours) The rest of the description, however, conformed to the one contained in the earlier deed. Nowhere in the first deed can any indication be found that the easterly line of the property bounded *partly on the end of Bellevue Avenue*. The superior court considered the variance between the descriptions in the two deeds as evidence on the part of plaintiff's immediate predecessors in title to "wall off" Bellevue Avenue short of its terminus at the shore. As evidence, however, that the Bailey and Smith heirs had recognized Bellevue Avenue as ending at the ocean, the trial justice pointed out that portion of the description of the land they conveyed to the trustees wherein it was stated that the property was bounded on the south by Bellevue Avenue and the Atlantic Ocean. While plaintiff seeks to attribute the discrepancy in the deeds to inartistic draftsmanship, we cannot say that the trial court's conclusions were unreasonable.

460

In urging that we overturn the findings of the trial justice, plaintiff points out that the underlying issue in this appeal is ascertaining the intent of the council and the commissioners in establishing the westerly end of Bellevue Avenue in 1852 which is achieved by construing the documentary and the admittedly uncontradicted testimonial evidence[4] adduced at the trial before the superior court. This being so, it claims the decision of the trial justice does not enjoy the degree of deference we accord to causes involving conflicting evidence. In support of this view, it cites *McKendall* v. *Tudor Arms, Inc.,* 56 R. I. 109, 184 A.178, and *Gillis* v. *Main,* 96 R. I. 88, 189 A.2d 808. While we acknowledge past statements by this court in support of the proposition urged by plaintiff, we believe the better rule is found in *Williams* v. *Rhode Island Hospital Trust Co.,* 88 R. I. 23, 143 A.2d 324, and subsequently reiterated by us on several other occasions.[5] There we said that it is the trier of facts who initially draws the inferences from the record before him. This is the business of a trial justice and this court will accept his inferences if they are reasonable — be they positive or negative. Here it was plaintiff's burden to show by a preponderance of the evidence that its fence and accompanying shrubs did not interfere with a public highway. The city was under no duty to offer any evidence in this regard. In fact, it offered none and rested at the conclusion of plaintiff's case. We have examined the transcript and exhibits in the light of the law applicable thereto and we are unable to say that the trial

[4]Most of this evidence consisted of testimony by witnesses as to the location of the bathing pavilion at Bailey's Beach near and shortly after the turn of the century. The 1938 hurricane washed away this structure and the new pavilion was built further north of the old building.

[5]*Arden Engineering Co.* v. *E. Turgeon Constr. Co.,* 97 R. I. 342, 197 A.2d 743; *Glass-Tite Industries* v. *Spector Freight Systems,* 102 R. I. 301, 230 A.2d 254.

justice's inferences and conclusions were unreasonable or clearly wrong.

We would point out further that here, unlike *Volpe* v. *Marina Parks, Inc.,* 101 R. I. 80, 220 A.2d 525, we are not confronted with a case where the trial justice has made an error of law. In *Volpe* we reversed the trial justice because his findings were based upon a misconception of the law relative to the extent of an area dedicated as a public highway. In the instant case no such error was committed.

We find no merit in plaintiff's contention that the commissioners' report varies from the order issued them by the council. It claims that there is a variance between the council's order to end the highway at or near the east end of the West Beach and their report in which they state they have run the road to the shore. It is our belief that the commissioners marked out a highway which in the language of the pertinent statute was "conformable to the direction of the town council." The commissioners' action must be construed in the light of the statutory provisions which set forth the procedures to be followed in laying out a highway.

In construing an act of the general assembly which contained the same language as the statute under which the Newport council and commissioners proceeded, this court in *Boston & Providence R. R. Corp.* v. *Town Council,* 13 R. I. 705, 708, said:

> "* * * we are of opinion that the statute does not require in the preliminary decree any description of the highway further than a definition, as near as reasonably may be, of the two terminal points. The statute, having provided that the highway shall be judged necessary and the committee appointed, directs that the committee 'shall go to the place where such highway is ordered to begin' and then perform their duty as further specified. It seems to us almost a necessary inference that the only instruction required to be given them is as to the initial, and, *perhaps by implication,*

462

the terminal point, and that all other particulars are left to their judgment after examination of the ground and consultation with those especially concerned." (italics supplied)

In our opinion the council's minutes in which it described its dealings with the commissioners understandably do not exhibit the accuracy found in a document prepared by a skilled conveyancer. Such an absolute preciseness cannot be demanded or expected in a judicial review of the council's proceedings. It is sufficient, we believe, that the termini of the proposed road can be identified with reasonable certainty. In determining the proposed beginning and end of Bellevue Avenue, resort may be made to the petition filed with the council wherein the petitioners sought a road from the ocean to the then end of Bellevue Avenue. The petition was accepted and approved and it is reasonable to believe that the proposed extension was to end at the ocean.

It is also to be pointed out that the commissioners' report was approved and recorded. The plan showing the seven specific courses, with the last one running to the shore, was annexed to the report and was part of the report. This report confirmed the western terminus as being at the shore. Access to the shore is as valuable a constitutional right today as it was in 1852. The documents concerning the establishment of the extension of Bellevue Avenue were duly executed and filed according to law and their subsequent loss or disappearance should not defeat the right of the public in the way as it was laid out in 1852.

In his decision, the trial justice rejected an argument proposed by plaintiff that if Bellevue Avenue as laid out in 1852 did extend to the shore, then the public's right to travel over that portion of the road which lies beyond its fence was transferred by Bailey and Smith when in 1866 they granted the city of Newport a right of way which skirted Bailey's Beach to the north. In making this argument

plaintiff relies on the substitution or transfer of way theory promulgated by this court in *Almy* v. *Church*, 18 R. I. 182, 26 A. 58. There we said that if under a dedication of a new public highway another way equally convenient as the old has been substituted by general and long continued acquiescence for the original way, the right of the public in the old way although not extinguished is transferred to the new road.

The trial justice in rejecting plaintiff's substitution theory pointed out that there was a complete absence of any evidence that any other highway had been substituted for Bellevue Avenue as it was laid out in 1852. He found that the 1866 right of way was not as equally convenient as the original street. The right of way, he observed, afforded no access to the shore as did the 1852 road. We can find no fault with the court's finding in this regard and affirm his rejection of the applicability of the rule in *Almy*.

In a last effort to keep its fence mended, plaintiff asks us to invoke the doctrine of equitable estoppel whereby the city would be precluded from removing the barrier it presently maintains across Bellevue Avenue. This theory of law now advocated by plaintiff has been followed by some courts and severely criticized by others. See 11 McQuillin, *Municipal Corp.* (3d ed. rev.), sec. 30.181. McQuillin points out that equitable estoppel is applied with much caution to municipal corporations in matters pertaining to their governmental functions. The basis for application, the author states, is not because of non-action by a municipality but because it has done some affirmative act which influenced another whereby it would be inequitable to permit the city or town to assert a different set of facts. Although in *Almy, supra,* when we adopted the substitution of a way theory we did allude to the doctrine of estoppel, this court has not been called upon to take a position as to whether or not a municipality can be estopped from assert-

ing rights in and to a public highway. It is not necessary that we take a position in the instant case for the following reasons.

In their answer, defendants categorically denied an allegation in plaintiff's complaint that the city or the public had never asserted any claim to the land west of its fence and they referred in their answer to a 1903 resolution of the city council and report rendered by the city solicitor in the same year. The transcript shows that pretrial statements made by counsel for both parties before the presiding judge made it clear that the sole issue to be tried by the superior court was the location of the western terminus of Bellevue Avenue and nothing more. The doctrine of equitable estoppel was not pursued in the court below nor was any evidence adduced in support thereof. As we stated in *Point Trap Co.* v. *Manchester,* 98 R. I. 49, 199 A.2d 592, the only issues entitled to be reviewed in this court are those properly raised in the court below. An issue which was not before the trial justice is not properly before us on appeal and will not be considered. *Nugent ex rel. Lingard* v. *Harris,* 95 R. I. 137, 184 A.2d 783.

We can see no valid reason which would prompt us to depart from our previously announced position. This issue if to be considered by us should have been raised in the trial court.

The plaintiff's appeal is denied and dismissed. The judgment appealed from is affirmed.

*Moore, Virgadamo, Boyle & Lynch, Cornelius C. Moore, Jeremiah C. Lynch, Jr.,* for plaintiff.

*James S. O'Brien,* City Solicitor, for defendants.