Leroy V. MARCOTTE as Administrator
of the Estate of Albin A. King

v.

Eugene HARRISON et al.

No. 79–251–Appeal.

Supreme Court of Rhode Island.

April 2, 1982.

David J. Kehoe, Warwick, for plaintiff.

Gunning, LaFazia & Gnys, Inc., Robert W. Smith, Providence, for defendants.

## OPINION

SHEA, Justice.

This is a civil suit in which the plaintiff-administrator d.b.n.c.t.a., Leroy V. Marcotte,[1] proceeding on behalf of the estate of Albin A. King (the estate), seeks to enforce the payment of two promissory notes, one for $8,000 and the other for $1,500, given by the defendants, Eugene and Doreen M. Harrison, to the decedent in 1972. The defendants counterclaim against the estate under a theory of implied contract to recover the reasonable value for care and services which they rendered to the decedent during the year preceding his death in May 1973. They fix the value of their services at $12,000. These issues were tried before a jury of the Superior Court.

In the course of the trial, a directed verdict was granted in favor of the estate affirming the Harrisons' liability and the amount owing to the estate on the $1,500 note. The court entered judgment for $1,500 plus interest at the stipulated annual rate of 6 percent, for a total of $2,083.17. The trial justice also directed a second verdict in the estate's favor on the $8,000 note concerning liability, reserving for the jury's judgment, however, the issue of the amount due. The jury found the Harrisons' indebtedness on the $8,000 note to be $10,274.94, including the unpaid principal and interest. The jury further found in favor of the Harrisons' counterclaim, awarding $6,500 for their care of and services to Mr. King. However, the trial justice granted the estate's motion for a new trial on the counterclaim.

The Harrisons appeal from the directed verdict in the estate's favor, and they appeal the denial of their motion for a new trial and/or a remittitur with regard to the $8,000 note. Further, the Harrisons appeal

---

1. The present plaintiff is the estate's third administrator. He succeeded Harold P. Wright as administrator d.b.n.c.t.a. on January 7, 1982, following Wright's death on July 17, 1981. Wright himself became administrator after the death of the executrix, Charlotte O. Botticher, on June 28, 1975.

the granting of the estate's motion for new trial on their counterclaim. The estate cross-appeals the denial of its motion for a directed verdict on the Harrisons' counterclaim. We affirm the actions of the trial justice.

The facts of this case are rather complex. Some factual background will be necessary in order to place in the proper context the events giving rise to the litigation. As we determine the issues presented by the parties we will refer to additional facts as necessary.

The decedent Albin King first met the Harrisons in the early fall of 1971. The meeting involved the sale by King to the Harrisons of a cabin plus surrounding acreage located in Foster, Rhode Island, which was the King family's ancestral home. By the time of this sale, Albin King was the last surviving member of his family. The Harrisons bought the Foster property intending to construct modern living quarters out of the cabin for themselves and their five children. Their reconstruction and rehabilitation were quite extensive.

Because of his sentimental attachment to the property, King was deeply interested in the Harrisons' plans. He periodically visited to view their progress. In addition, the Harrisons kept King regularly informed about the building and restoration. On his visits to the property King was sometimes accompanied by his longtime friend, Charlotte O. Botticher. He and Miss Botticher were also occasional dinner guests in the Harrisons' home. A friendship among the Harrisons, King and Miss Botticher developed as the weeks passed.

Soon after the Harrisons moved into the reconstructed house in March 1972, King, then about ninety-one years old, took seriously ill and was hospitalized. Three or four weeks later, Charlotte Botticher approached the Harrisons on behalf of King to request that they allow him to convalesce in their house, thereby avoiding the necessity of sending King to a nursing home. The

Harrisons agreed. It was the Harrisons' impression at the time that King's period of initial recuperation would be relatively short, that is, until he could "get his strength back." Ultimately, however, King spent more than a year in Foster before his death on May 26, 1973, having arrived in Foster after his discharge from the hospital on May 6, 1972.

Early in King's stay in Foster, in mid-May 1972, he informed Eugene Harrison that the city of Providence had cited him for certain housing-code violations on King's two-family residence located at 6 Sumter Street in Providence. He offered to sell the property to Eugene Harrison because he, King, could not take care of it any longer. At first Harrison was reluctant to buy it, but he ultimately agreed. To finance the transaction, King and the Harrisons executed the now-contested $8,000 promissory note dated May 31, 1972. The note was made payable over fifteen years at 6 percent per annum in equal monthly installments of $67.51, commencing on December 1, 1972. Later, on June 19, 1972, the Harrisons executed the second note to King for $1,500, payable with stated interest of 6 percent per annum. The second note provided:

"For materials and shingles, paint, doors and casings on King Road, Foster, R.I., and also repairs, shingles and renovation and paint at 6 Sumter [Street], Providence, R. I., to satisfy the City of Providence. To be paid with insurance claim or sale of 6 Sumter Street, Providence, R.I., whichever comes first."

Repayment of this second note was conditioned upon the occurrence of one of two events: receipt of certain insurance proceeds[2] or the sale of the Providence property. Both notes bear the signatures of Eugene Harrison and Doreen Harrison.

The Harrisons immediately began renovation of the Sumter Street property. Eugene Harrison estimated that he invested a further $5,000 to $6,000 in the renovations.

---

**2.** The Harrisons were expecting reimbursement from an unrelated automobile insurance claim at the time they executed the $1,500 note.

That property was completely destroyed by fire in January 1973. The Harrisons did carry appropriate insurance as required by statute,[3] and in February 1973 they received a check from the insurer for $15,000, naming the Harrisons and King as payees.[4]

At the time this case was tried, the Harrisons had made six payments on the $8,000 note and had repaid nothing on the $1,500 note.

We turn first to the matter of the $1,500 promissory note. The Harrisons argue that the trial justice erroneously directed a verdict for the estate regarding both the Harrisons' liability and the amount due thereon. They specifically point out that when suit was filed on March 7, 1974, the note was not yet due and payable because neither of the two events, either of which was a condition precedent to repayment, had yet occurred. Since neither of the conditions had occurred before suit was filed, any claim to the note would be premature.

■ In considering a motion for a directed verdict, this court must do what the trial justice is called upon to do in the first instance. We examine the evidence and all inferences reasonably flowing therefrom in the light most favorable to the nonmoving party. We do not consider the credibility of the witnesses or the weight of the evidence. We then determine whether or not there is evidence for the jury to consider which would warrant a finding in favor of the nonmoving party. If we conclude that there is evidence supporting that party or that there is evidence on which reasonable minds could differ, then the jury is entitled to decide the facts of the case. *Pray v. Narragansett Improvement Co.*, R.I., 434 A.2d 923 (1981); *Johnson v. Palange*, R.I., 406 A.2d 360 (1979).

■ The record reflects that the estate made claim to the $1,500 note from the outset. At trial the estate introduced the note as a full exhibit. Eugene Harrison admitted that his signature and his wife's signature appear on the note as makers. The Harrisons received the $1,500 from King. Harrison admitted that they had repaid nothing on this note. He testified that reference in the note to an insurance claim dealt with an unconnected automobile insurance claim of the Harrisons that would, when paid, serve to mark the time when the note was to become due and payable. He admitted as well that he had received those insurance proceeds in the amount of $1,500 in early 1978. Harrison also established that after its destruction by fire the Sumter Street property had been sold by the city of Providence for delinquent taxes. It is uncertain just when that transaction occurred. Nevertheless, by the time of trial, both events that were conditions precedent had in fact occurred.

In ruling on the estate's motion for a directed verdict, the trial justice recited these facts. He concluded that the Harrisons had no defense to the note and that it was therefore due and payable. He said it was immaterial that the note may or may not have been due at the time suit was instituted. He noted that no proper objection had been made to the introduction of the note into evidence or to the testimony relating to it.

The Harrisons argue to this court that they in fact did properly object. Our review of the record indicates that defense

3. General Laws 1956 (1969 Reenactment) § 34–11–20.

4. There is much conflict concerning the fire insurance check. The Harrisons contend that King, out of gratitude for their care, and in view of the amount of money they had put into the renovations, said the Harrisons could keep it. The estate maintains, however, that the Harrisons appropriated the check for themselves, never having brought the check to King's attention. Although the check is not central to any claim presented on appeal, the trial justice considered it as it bore on the Harrisons' credibility when he ruled on the estate's motion for new trial regarding the Harrisons' counterclaim. The necessary endorsements were all signed by Doreen Harrison. She claimed that when she asked King to sign, he answered her, "[N]o, you take care of it." At the time, King was capable of signing his name. She also had her husband's permission to sign his name. Mrs. Harrison signed so as to make these two signatures dissimilar to her own.

counsel objected to evidence regarding that note on the ground that it was premature. This objection was made at the time when the estate's counsel asked Eugene Harrison if he had received payment of his outstanding automobile insurance claim. The objection appears in the record only after the note was admitted as a full exhibit and testimony had been taken with reference to it. We conclude that the evidence concerning the $1,500 note was properly admitted and that it was a proper basis for directing a verdict against the Harrisons on this issue.

The Harrisons' contention that suit on the $1,500 note was premature required more than just an objection made in the course of the trial. In the Harrisons' answer to the complaint they admitted they had executed the note and they asked that it be set off against their counterclaim. To raise the issue of prematurity and to preserve it for consideration on appeal, they were first required to plead it specifically, according to Rule 9(c) of the Superior Court Rules of Civil Procedure. The rule states in relevant part:

> "(c) Conditions Precedent. * * * A denial of performance or occurrence [of conditions precedent] shall be made specifically and with particularity."

Consequently, if we were to disregard the evidence that the trial justice had before him, the Harrisons failure to specially plead the matter of conditions precedent would still constitute a waiver. The trial justice correctly refrained from considering the question of prematurity. The $1,500 note and the testimony referring to it were properly admitted and lead inescapably to the finding of liability thereon.

The Harrisons next contend that the trial justice erroneously directed a verdict in favor of the estate regarding their liability on the $8,000 note secured by the mortgage taken back by King on the Sumter Street property. The Harrisons made six payments on the note, the last payment shortly before King's death.

Eugene Harrison testified that in mid-May 1973, one year after the execution of the $8,000 note, he and King had a conversation in which King orally canceled all further payments. Harrison said that King did this out of deeply felt gratitude for the care and services rendered him in the Harrison home during the preceding year. The Harrisons argue that their care of King prior to and after the alleged cancellation constituted sufficient consideration to support the cancellation of the note.

The Harrisons' claim of cancellation by King constitutes an affirmative defense that must be pleaded affirmatively in a defendant's answer or it is waived. Rule 8(c) of Super.R.Civ.P. The estate correctly points out that the Harrisons failed to plead cancellation of the contract. The record also indicates that the estate made timely objection to the evidence of cancellation, thereby preserving its right to argue the issue on appeal.

■ However, because of the way this evidence came into the record, the estate may not now argue that the Harrisons waived the defense nor may it argue that the admission of evidence on the issue of cancellation by the trial justice constituted reversible error. The estate had called Eugene Harrison as an adverse witness. He was cross-examined concerning the $8,000 note and this cross-examination brought out the fact that the Harrisons made no payments on it after May 1973. The trial justice correctly allowed Harrison's attorney then to examine Harrison about the reason for the nonpayment. Nevertheless, because of our conclusion that the trial justice properly directed a verdict for the estate, the evidence of cancellation did not unduly prejudice the estate.

As the trial justice stated when he considered the estate's motion for directed verdict, he viewed the evidence from the Harrisons' point of view, drawing all reasonable inferences favorable to them. He found that no consideration passed from the Harrisons to King. He also found that what King had attempted to do, if he had attempted to do anything, was to make a gift of the note to them. However, a gift failed because there was no delivery.

We agree with the trial justice that no bargained-for exchange occurred between King and Harrison. Consideration consists either in some right, interest, or benefit accruing to one party or some forbearance, detriment, or responsibility given, suffered, or undertaken by the other. *See Hayes v. Plantations Steel Co.*, R.I., 438 A.2d 1091 (1982) and cases cited therein. Valuable consideration is said to induce the return act or promise. *See Id.*

In this case the evidence does not establish that the Harrisons' care of King and King's alleged attempt to cancel orally the $8,000 note were opposite sides of the same bargain. None of the parties were affected by what King allegedly said. There is no evidence in the record to show that the Harrisons' care of King in any way changed or improved. Nor was King contemplating the risk that the Harrisons were about to cut off their kindness unless he offered some incentive for them to continue. Furthermore, the Harrisons' assertion that such a legal exchange occurred seems inconsistent with their counterclaim for compensation for their services. As the trial justice concluded after viewing the evidence and drawing all inferences favorably to the Harrisons, it is clear that if in fact the conversation did occur, King merely attempted to make a gift of the $8,000 note. The gift, as we have said, must fail in the absence of any evidence that the note was actually delivered to the Harrisons. Eugene Harrison admitted on cross-examination that neither at the time of his alleged conversation with King or at a later time did he ask King to return the note, nor did he ask King to sign a written discharge. Clearly no consideration passed from Harrison to King that would have justified a finding of cancellation.

The Harrisons argue in their brief that the note is also a negotiable instrument under the Uniform Commercial Code and that as a result King could have canceled it validly without receiving consideration in return. General Laws 1956 (1969 Reenactment) § 6A–3–605 provides that a negotiable note may be canceled without consideration either by (1) an intentional destruction or mutilation of the note, or by deletion of the parties' signatures thereon, or (2) by a written renunciation of right to the note signed and delivered by the party granting relief or by surrender of the note to the party to be discharged. The trial justice considered these provisions and concluded, "None of these methods were used." He continued, "It is clear then, as a matter of law, that the attempt of Mr. King to cancel this note was legally ineffective." The trial justice correctly determined that there had been no valid cancellation of the $8,000 note, if in fact a cancellation had been attempted, and that the Harrisons remained liable thereon.

The jury returned a verdict for the estate on the $8,000 note in the amount of $10,274.94, which included principal and stipulated interest. The Harrisons moved for a new trial and/or a remittitur. They argued to the trial justice and in this court that the verdict constitutes an acceleration of the note by making a fifteen-year note fully payable at a time when only six years and twelve days had passed from December 1, 1972, the beginning of payment, up until the date of the verdict.

The Harrisons argue that the jury should have considered only the amount due during these intervening years. They correctly point out that the trial justice instructed the jury that the estate was obligated to show by a preponderance of the evidence "how much is now due and payable." They claim that acceleration had never been an issue during the trial and that the estate had never introduced evidence concerning acceleration. They maintain that the trial justice was therefore not obligated to instruct the jury regarding acceleration and that the jurors should never have considered it. They assert that no more than approximately $4,890 was due on the note at the time the jury returned its verdict.

In his instructions to the jury the trial justice referred to the testimony of the then administrator of the estate, Harold P. Wright, in which Wright computed the outstanding balance due on the note. The trial

justice cited the figure as approximately $9,500. But following the instruction, the estate's attorney corrected the trial justice by citing Wright's exact figure of $10,-657.71 outstanding, including principal and interest.

Our review of the record indicates that at no time during the trial or after the jury charge did the Harrisons object to the use of these figures. It seems clear that testimony and discussion of sums in the neighborhood of $9,000 to $10,000 should have alerted the Harrisons to the possibility that the jury would accelerate the note. Admittedly the note itself contains no provision for acceleration. However, the Harrisons did not object to the evidence when Wright testified nor did they object to that portion of the trial justice's charge. No contrary evidence or computations were offered. Their appeal on this point therefore must fail. *Spouting Rock Beach Association v. Garcia*, 104 R.I. 451, 244 A.2d 871 (1968). An issue that was not before the trial justice is not properly before us on appeal and will not be considered. *State v. Byrnes*, R.I., 433 A.2d 658 (1981).

This brings us to the Harrisons' final issue on appeal. They claim that the trial justice erroneously granted the estate's motion for a new trial on their counterclaim for which the jury returned a verdict in the amount of $6,500 exclusive of interest.

The rule governing motions for new trial is well settled. In considering such a motion the trial justice must exercise his independent judgment, consider all of the material evidence in light of his charge to the jury, and pass upon the weight of the evidence and the credibility of the witnesses. *Barbato v. Epstein*, 97 R.I. 191, 196 A.2d 836 (1964). If the trial justice properly performs these functions, this court will not disturb his decision unless the appellant is able to show that the trial justice overlooked or misconceived material evidence or was otherwise clearly wrong. *Borowski v. Gelco I.V.M. Leasing Co.*, R.I., 397 A.2d 1315 (1979). The trial justice may accept some or all of the evidence. He may reject evidence that is impeached or contradicted by other positive testimony or circumstantial evidence. Or he may disregard testimony that contains inherent improbabilities or contradictions or which is totally at variance with undisputed physical facts or laws. He may also add to the evidence by drawing proper inferences. *Turgeon v. Davis*, R.I., 388 A.2d 1172 (1978). If the trial justice finds that the evidence is nearly balanced or is such that different minds can naturally and fairly come to different conclusions, then he should approve the verdict, even though he may entertain some doubt regarding its correctness. *Bouley v. Gibney*, 113 R.I. 522, 324 A.2d 318 (1974). Should the trial justice fail to carry out his task, this court will then review the evidence in the light most favorable to the prevailing party; and if there is any competent evidence to support the jury's verdict, the motion for new trial is denied. *Morinville v. Morinville*, 116 R.I. 507, 359 A.2d 48 (1976).

There is considerable conflict in the evidence relating to the Harrisons' counterclaim. Much of the conflicting testimony is in the deposition of Charlotte Botticher which the trial justice allowed into evidence. The estate had properly noticed the taking of her deposition to preserve her testimony for trial. The parties were aware of her poor health. Her deposition was taken on June 11, 1975, and indeed she died on June 28, 1975.

We must first consider the admission of Miss Botticher's deposition into evidence over the Harrisons' objection on the grounds that it was never completed. The Harrisons were not able to finish their cross-examination prior to Miss Botticher's death. They argue that this makes the entire deposition inadmissible. We disagree.

The record reveals that Miss Botticher left the deposition immediately after being confronted with evidence that appeared to contradict much of her direct testimony in which she claimed that the Harrisons had provided very little service to King. This impeaching evidence was a letter she had written to the Harrisons shortly after

King's death, rather profusely expressing gratitude to them for everything they had done for King. On being confronted with the letter, she interrupted the deposition, explaining that she needed to return home in time to receive a telephone call from her physician. She died before the deposition resumed.

The Harrisons claim they had no opportunity to cross-examine Miss Botticher about the letter, about her personal checks made out to Doreen Harrison, about the frequency of her visits to Foster, about where she slept in Foster, and about the preparation of King's meals and other services.

█ This court has had occasion to discuss the importance of cross-examination. *State v. Byrnes, supra.* Without question it is a vital element of the factfinding process. Nevertheless, we believe that in civil cases the right of cross-examination is "not so all pervasive that it automatically forecloses the possibility that competing considerations may be of equal magnitude." *Treharne v. Callahan,* 426 F.2d 58, 62 (3d Cir. 1970). In the case before us the interruption of Miss Botticher's cross-examination must be weighed against what would result if all of her testimony were suppressed. Here, we must remember, considerable cross-examination was completed before the interruption.

█ When a witness or deponent dies before completion of the cross-examination, the question of whether or not to strike the direct testimony is to be left to the sound discretion of the trial justice. 5 Wigmore, *Evidence* § 1390 (Chadbourn rev. 1974). This court will not reverse the trial justice's decision to admit the deposition unless we find that he was clearly wrong or has abused his discretion. On the present record we find neither error nor abuse of discretion.

█ It is important for us to keep in mind that this is not a situation in which there was no opportunity for cross-exami-

nation. *Cf. Pollard v. Pollard,* 166 Cal. App.2d 698, 333 P.2d 356 (1959) (total lack of cross-examination caused by party producing the deponent; deposition excluded). The record of the deposition indicates that in the elapsed time of two hours and forty-five minutes, Charlotte Botticher answered 498 questions. Of these questions, 292 were asked on cross-examination. At the point of interruption the Harrisons' attorney stated that she had only about thirty minutes of further questioning left.[5]

The Harrisons concede on appeal that the most important documents are Miss Botticher's letter and her canceled checks. These items were admitted into evidence as full exhibits, and the jury was able to consider and evaluate their significance. The record also indicates that contradictions in Miss Botticher's testimony had already appeared, particularly concerning the frequency of her visits to Foster, the transportation provided her by Doreen Harrison, and some of the Harrisons' alleged services to King. Also the record disclosed Miss Botticher's interest as the sole beneficiary of King's estate.

In the trial justice's instructions to the jurors he explained their duty to evaluate the credibility of the witnesses. He specifically mentioned the need to assess the credibility of Miss Botticher's deposition. Given all of these circumstances, we believe that the direct and cross-examination that did occur was "so substantially complete as to satisfy the requirement of opportunity to cross-examine." (Footnote omitted.) *McCormick's Handbook of the Law of Evidence* § 19 at 45–46 (2d ed. Cleary 1972). Therefore the trial justice committed no error in allowing the deposition into evidence.

█ This brings us to the trial justice's granting of the estate's motion for a new trial on the Harrisons' counterclaim for the value of services rendered to King. Our review is limited to a determination of whether or not the trial justice overlooked

---

5. Miss Botticher's departure was not a great surprise to the parties. The record shows that at an earlier point in the deposition Miss Bot-

ticher had already stated that she did not feel well and had to return home to await her physician's call.

or misconceived material evidence or was otherwise clearly wrong. We conclude that he properly performed his task in deciding to grant the new trial.

The evidence regarding the counterclaim is in serious conflict particularly with reference to the services that the Harrisons may or may not have rendered to King and also to Charlotte Botticher. It also deals with the compensation that the Harrisons received or expected to receive from King and Miss Botticher.

It was Doreen Harrison's testimony that she performed most of the services rendered to Albin King. She gave King all his medications and did all of his cooking and laundry. In the early stage of King's recuperation while he was still quite disabled, she helped him up and down the stairs once he was able to get out of bed, which was about ten days after his arrival in Foster. She drove him to his barber and to his doctor. Mrs. Harrison also said that she kept King company while she took care of household chores. They watched television together, played checkers, or simply talked. She testified that King would speak about the history of the house, and would often say how grateful he was to be able to return to the place where his family had spent so much time. Mrs. Harrison testified that she did not expect King to compensate her and her husband. There were no specific conversations with King about compensation. However, Mrs. Harrison insisted that, "Al said that we'd be well taken care of."

Eugene Harrison's testimony was consistent with his wife's. He said that they did not charge King for room and board, nor had they ever discussed it with him. Instead, according to Mr. Harrison, King often repeated that he felt very grateful for Mrs. Harrison's services and that he would be certain to take care of her. According to Mr. Harrison, King allegedly made this statement "three or four times a month all the while the whole year that he was there."

Charlotte Botticher on the other hand stated that the Harrisons provided little service to King even after King's condition worsened in the fall of 1972. Mrs. Harrison would prepare King's meals and occasionally buy his medications. Miss Botticher said that when she was visiting, she brought King his meals herself if he did not eat with the Harrisons. She said that King usually was able to go up and down the stairs and get back and forth to the bathroom by himself. Miss Botticher testified that King authorized her to make an agreement with the Harrisons for King's own room and board. Accordingly, she spoke with Mrs. Harrison, and they agreed to a payment of $15 per week. Several months before King died the figure was raised to $20 per week by King himself. Miss Botticher paid the Harrisons for King by issuing her own semi-monthly checks in the amount of $30 (later $40). She paid by her own check because she wished to have a record of payment and because King had no checking account of his own. King would reimburse her with cash. He would reimburse her for other items as well, such as medications that she claimed to have purchased for him herself. In view of Miss Botticher's fairly regular presence in Foster including overnight visits, she contributed groceries and/or $5 to $10 in cash each time she arrived.

The Harrisons denied the receipt of any money or goods from Charlotte Botticher except for her checks. They claimed that the checks were her own payments for, among other things, meals she had with the Harrison family and for the transportation supplied her by Mrs. Harrison to and from Foster from May 1972, when King first arrived, until January 1973, when King gave his car to Miss Botticher.

There was documentary evidence relating to the counterclaim that includes Charlotte Botticher's checks, a 1973 calendar belonging to King, and Charlotte Botticher's letter to the Harrisons written shortly after King's death at the end of May 1973. There are thirty canceled checks in evidence which were made out to Doreen Harrison by Charlotte Botticher. In the lower left corner of each check is written a set of

dates apparently indicating the period that the check covered. The first check covers the period "May 6–12/13–19." King first arrived in Foster on May 6, 1972. Each succeeding check covers a two-week period. King's 1973 calendar shows almost daily reminders of different activities. The notations include such items as "pills," "haircut," and appearing on every second Friday, "rent." Charlotte Botticher testified that King himself generally wrote these reminders on the calendar and checked them off as he took his pills, went to his appointments, and paid his rent via her checks. Miss Botticher's letter to the Harrisons after King's death expressing her deeply felt gratitude for everything the Harrisons had done for King, speaks only in a general way and fails to elaborate on the nature of all the "little things as well as the big things" that the Harrisons did for King.

The trial justice reviewed all of the evidence thoroughly. He gave credibility to the estate's evidence and discredited the testimony of the Harrisons. He specifically found that an express agreement existed between King and the Harrisons that King would pay $15 (later $20) per week for his room and board, which fee Miss Botticher paid with her own checks. We find this to be a reasonable conclusion.

The Harrisons argue to this court that these checks were not for King but for Miss Botticher. As proof they refer to checks No. 278 and No. 284 covering September 23 through October 20, 1972; King suffered a relapse and was in the hospital and a nursing home between September 29 and October 14, 1972, before returning to Foster. There was no direct evidence explaining why Miss Botticher issued the two checks despite King's absence. One reasonable inference to be drawn is that Miss Botticher was simply being generous to the Harrisons. There is other evidence to support that inference. King's date of death, May 26, 1973, occurred in the middle of what became the last two-week rental period. According to Miss Botticher, Doreen Harrison offered to return one-half of the rent, but she was told simply to keep it. Also check No. 249 gives credit to the Botticher testi-

mony and the trial justice's findings of an express agreement. The memo line on the lower left reads "July 15–21/22–29 *for A. King.*" (Emphasis added.) It is the only check out of all thirty checks in evidence which states "for A. King." However, it is a check that follows the pattern of the entire group. Also, it is reasonable to conclude that these checks were written in correspondence with King's 1973 calendar. It shows the designation of "rent" on every second Friday from January through May 1973. It is reasonable to conclude that the same pattern existed from May through December 1972. The credibility of the Harrisons' version of events is further undermined when we consider that the amount of the checks was increased to $40 at a time when a part of the Harrisons' service to Miss Botticher, that is transportation, was made unnecessary by her acquisition of King's car. It is clear from all of the evidence that neither King nor Miss Botticher was extravagant in money matters. It would have made little sense for Miss Botticher to pay one-third more money for less service after she began to drive herself around in King's car.

The trial justice reviewed these facts and examined the checks and the calendar entries. He said he believed that the Harrisons "deliberately lied" about their financial dealings with King and Miss Botticher. He specifically found to be untruthful the Harrisons' testimony that no rental agreement existed between them and King, that King had canceled their debt to him, and that he had given them his share of the fire insurance check covering the mortgaged Sumter Street property. Upon our review of this entire record we cannot say that the trial justice overlooked or misconceived material evidence or was otherwise clearly wrong. He was fully justified in deciding that the jury's verdict on the counterclaim was not responsive to the credible evidence and failed to do substantial justice between the parties. We find no error in his award of a new trial on the counterclaim.

■ Finally, the estate has appealed from the denial of its motion for a directed

verdict on the counterclaim. Counsel argues that the granting of a new trial buttresses its argument that it was entitled to a direction on that claim. We disagree. Our examination of the record persuades us that a denial was proper in view of the evidence before the trial justice and the standard of review employed by him on such a motion.

For all of the foregoing reasons the Harrisons' appeal is denied and dismissed. The appeal of the estate is denied and dismissed, and the case is remanded to the Superior Court for a new trial on the counterclaim.