DECISION
This matter is before the Court on the motion of the plaintiff, Linda Franco, for a new trial, pursuant to Super. R. Civ. P. 59, to which the defendant objects. On October 24, 2001, the jury returned a verdict in favor of defendant, Joseph A. Latina, M.D.
 Facts/Travel
The plaintiff brought a medical malpractice action against the defendant which was tried before a jury in October of 2001. The plaintiff alleges that the defendant negligently performed surgery thereby causing her to suffer and become afflicted with severe personal injuries and extreme pain and suffering. (Pl.'s Compl. at 2.) In addition, the plaintiff claims that the defendant "failed to inform Plaintiff of the risks of harm attendant to the performance of the treatment in question and to obtain Plaintiff's informed consent." (Pl.'s Compl. at 3.) As a result of defendant's negligence, plaintiff claims that she suffers "great pain of body, nerves and nervous system, she was severely disfigured, she was rendered disabled, she has suffered both a loss of wages and earning capacity." (Pl.'s Compl. at 2 and 3.) On October 24, 2001, the jury found in favor of the defendant on both the negligence and lack of informed consent counts by responding in the negative to the following questions:
 "1. Do you find that Plaintiff Franco has proven, by a fair preponderance of credible evidence, that Defendant Latina was negligent in 1/31/96, and that such negligence was the proximate cause of Plaintiff's injuries?
 2. Do you find that Plaintiff Franco has proven, by a fair preponderance of credible evidence, that Defendant Latina failed to disclose all the known material risks of the laparoscopic surgery, that if he had disclosed all the known material risks Plaintiff would have chosen to have an open surgery, and that Plaintiff was injured by the laparoscopic surgery?"
Plaintiff timely filed the instant motion for a new trial to which the defendant objected. In her motion, the plaintiff asserts that a new trial should be granted because the jury verdict in favor of the defendant was clearly against the great weight of the credible evidence. Moreover, the plaintiff contends that the verdict was either the result of confusion on the part of the jury or its sympathy for the defendant. Conversely, the defendant responds that the jury had adequate credible evidence to support its verdict which should not be disturbed.
 Standard of Review
This case comes before this Court pursuant to Super. R. Civ. 59, which provides that:
 "[a] new trial may be granted to all or any of the parties and on all or part of the issues, (1) in an action in which there has been a trial by jury for error of law occurring at trial or for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of this state."
The role of a trial justice when reviewing a motion for a new trial is well settled in this jurisdiction. The trial justice, sitting as an extra juror, must "independently weigh, evaluate and assess the credibility of the trial witnesses and evidence." Graff v. Motta, 748 A.2d 249, 255 (R.I. 2000) (quoting Morrocco v. Piccardi, 713 A.2d 250, 253 (R.I. 1998) (per curiam)). He or she may accept some or all of the evidence and reject testimony because it is impeached or contradicted by other positive testimony or by circumstantial evidence or because it is inherently improbable or at variance with undisputed physical facts or laws. Barbarto v. Epstein, 97 R.I. 191, 193, 196 A.2d 836, 837 (1964). The trial justice also may add to the evidence by drawing proper inferences. Id. at 193-94, 196 A.2d at 837. Upon determining that the evidence is evenly balanced or is such that reasonable minds, in considering the same evidence, could come to different conclusions, the trial justice must allow the verdict to stand, Graff, 748 A.2d at 255, even if the trial justice entertains some doubt as to its correctness. Marcotte v. Harrison, 443 A.2d 1225, 1232 (R.I. 1982). However, if after making an independent review of the evidence, the trial justice finds that the jury's verdict is against the fair preponderance of the evidence and fails to do substantial justice, the verdict must be set aside. Reccko v. Criss Cadillac Co., Inc., 610 A.2d 542, 545 (R.I. 1992) (citing Sarkisian v. New Paper, Inc., 512 A.2d 831, 835 (R.I. 1986)). Even though the trial justice "need not perform an exhaustive analysis of the evidence, he or she must refer with some specificity to the facts which prompted him or her to make the decision so that the reviewing court can determine whether error was committed." Reccko, 610 A.2d at 545 (citing Zarrella v. Robinson, 460 A.2d 415, 418 (R.I. 1983)).
 Review of the Evidence
The parties in this matter presented two very distinct theories of this case. The plaintiff asserts that the evidence, including the testimony of the defendant, established that the standard of care for a reasonably competent surgeon performing a laparoscopic cholecystectomy in January of 1996 required identification of the anatomical structures before proceeding to clip and cut any biliary structures. The plaintiff contends that the defendant failed to meet this standard of care when he erroneously identified the common duct as the cystic duct. The defendant asserts that at the time of plaintiff's operation, he utilized a surgical technique that, if followed correctly, allows for "conclusive identification" of the cystic duct. Moreover, the defendant maintains that it was only recently that the medical community discovered that there was an inherent flaw in the technique that led to misidentification of the common and cystic ducts.
Regarding the issue of negligence, the Rhode Island Supreme Court has held "that a physician is under a duty to use the degree of care and skill that is expected of a reasonably competent practitioner in the same class in which he or she belongs acting in the same or similar circumstances." Sheeley v. Memorial Hospital, 710 A.2d 161, 167 (R.I. 1998). As such, the Court "believe[s] that the focus in any medical malpractice case should be the procedure performed and the question of whether it was executed in conformity with the recognized standard of care, the primary concern being whether the treatment was administered in a reasonable manner." Id. at 166.
To establish the standard of care for surgeons performing a laparoscopic cholecystectomy, the plaintiff relied on the testimony of expert witnesses and texts from a variety of medical journals. Dr. A. R. Moosa, an expert on laparoscopic cholecystectomy and the prevention of bile duct injuries,[1] testified that the standard of care required the proper identification of anatomical structures regardless of which technique was utilized by the surgeon. Dr. Moosa stated:
 "[t]he issue is you've got to identify everything one hundred percent. What maneuvers you do, how you do it, is up to the surgeon's judgment and the surgeon's personal preference. Now standard teachings since we started laparoscopic cholecystectomies, the surgeon must identify the junction of the gallbladder with the cystic duct. This is the area of the action." (Unofficial Trial Transcript, October 18, 2001 at 47-48.)
In addition, Dr. Moosa stated:
 "[y]ou have to dissect carefully, identify the anatomy and be one hundred percent sure what you're going to clip and divide." (Unofficial Trial Transcript, October 18, 2001 at 47-48.)
Similar testimony was elicited from Dr. James S. Brock, the Florida surgeon who became plaintiff Linda Franco's treating physician. When asked what steps the standard of care required for the prevention of injuries, Dr. Brock stated:
 "[t]he steps included placing traction on the gallbladder and on the neck of the gallbladder in appropriate ways to open the angle, so to speak, between the cystic duct and the bile ducts, dissecting and clearing off the peritoneum all sorts of fibrous tissues surrounding the gallbladder neck and cystic duct as to be able to clearly identify and to literally go around it circumferentially; similarly dissecting such tissues away from the artery to the gallbladder, so that one achieved a clear view of two structures only entering the gallbladder, one being the cystic duct, one being the cystic artery, and confirming that view and landmark, being able to move the neck of the gallbladder underneath the duct away from the adjacent liver well enough to see the liver on the far side, so to speak, of your dissection to confirm that anatomically you have identified the landmarks, your structures have been clarified and prior to placing any clips, making any cuts to any structures." (Unofficial Trial Transcript, October 17, 2001 at 11-12.) (Emphasis added.)
Plaintiff also introduced a number of medical journal articles into evidence to further establish the standard of care with respect to laparoscopic cholecystectomy. These articles state that before acting the surgeon must clearly identify the anatomical structures involved.[2]
Dr. Strasberg, a well-respected surgeon in the field, wrote that:
 "[m]any guidelines have been suggested to avoid misidentification of ducts, including instructions on direction of traction on the gallbladder, use of operative cholangiography, and the need to identify (55) or not to identify (11) the common bile duct-cystic duct junction. These are helpful and will be discussed, but in our opinion, do not emphasize the key issue, which is that misidentification is the result of failure to conclusively identify the cystic structures before clipping or division.
We believe that injury can be avoided by adhering to certain principles.[3]
The need to properly identify anatomical structures was highlighted when Dr. Strasberg and his colleagues stated:
 "[b]ecause the cystic duct and artery are the structures to be divided, it is these structures and these structures only that must be conclusively identified in every laparoscopic cholecystectomy. Accordingly, the cystic duct and artery should not be clipped or cut until conclusively identified."[4]
In this same article, they stated that:
 "[o]nly the conclusive identification of structures before division can prevent injury because of misidentification."[5]
Lastly, in an article published in 2000, Dr. Strasberg and his colleagues wrote:
 "[b]iliary injury during laparoscopic cholecystectomy continues to be an important cause of morbidity. Injury rates are probably decreasing, but have not yet attained the levels that were once present in the era of open cholecystectomy. The `classical' biliary injury occurs when the common bile duct is injured as a consequence of the mistaken belief that it is the cystic duct, ie, it is misidentified. The degree of severity of injury ranges from simple obstruction to excision of large parts of the extrahepatic biliary tree and, at worst, results in the need for a very high biliary reconstruction or even liver resection or transplantation."[6]
After reviewing all the expert testimony offered by the plaintiff in support of her position, this Court finds that it was defendant's own testimony that further and best supports the theory that defendant failed to meet the standard of care. The following exchange indicates that defendant failed conclusively to identify the critical anatomical structures:
 "Q: Now, isn't it true, Dr. Latina, that the bottom line of what the doctors who are experts in this particular field and in this particular procedure were advocating beginning in 1990 and through today through what they have written in the literature is the conclusive unmistakable identification of the structures that are supposed to be cut safely in a procedure like this?
 A: Correct.
 Q: And isn't it true that doctors such as Dr. Strasberg, doctors such as Dr. Hunter, doctors such as Dr. Adams published articles which contained recommended methods by which the doctor could and hopefully would conclusively identify the vital structures, cystic duct, cystic artery in this procedure?
 A: Yes.
 Q: There were differing methods, were there not, recommended as far as the techniques were concerned, to enable the surgeon to conclusively, unmistakable identify the proper structures?
 A: Correct.
 Q: So the standard of care, Dr. Latina, at the time you performed this procedure, whether it be the infundibular procedure or the critical safety zone procedure or any other procedure, the standard of care that you were obligated to follow, you and other surgeons doing this procedure was to do whatever was necessary to conclusively, unmistakably isolate and identify the cystic duct, correct?
 A: Correct.
 Q: You didn't do that in this case, did you?
 A: I was — I misidentified the cystic duct or I misidentified the common duct as the cystic duct." (Unofficial Trial Transcript, October 22, 2001 at 7-9.) (Emphasis added.)
Thus, Defendant's own testimony indicates that he knew that the standard of care required that he identify properly the anatomical structures involved. Moreover, defendant's testimony evidences that he was anatomically lost. Defendant should not have proceeded with the procedure until he had gained his bearings.
The defendant's theory of the case is that the technique he used in plaintiff's operation was an accepted method at the time and that it was not until a few years after he performed the procedure on plaintiff that the method was deemed by the medical community to be a flawed technique. Thus, defendant argues that he cannot be held liable for utilizing a procedure that was later deemed defective. Defendant's argument, however, misses the mark. Plaintiff's complaint is predicated not on defendant's use of an outmoded procedure but rather on his misidentification of her anatomical structures. Defendant acknowledged that no matter which method was employed by the surgeon, he was required to first isolate and identify the cystic duct. See Unofficial Trial Transcript, October 22, 2001 at 7-9. The method used by the defendant required that he properly identify the anatomical structures prior to clipping and cutting any structures. However, defendant testified that he failed to do this when he misidentified the cystic duct.
It is clear to this trial justice that the jury's verdict is not supported by the fair preponderance of the evidence, consisting of the expert testimony provided in court, the written materials submitted as exhibits, and the reasonable inferences drawn therefrom. The jury was confronted with substantial information which established that the standard of care in a laparoscopic cholecystectomy required the surgeon to identify properly the anatomical structures before clipping and removing any structures. The defendant acknowledged that such identification was required and admitted that he misidentified the anatomical structures.
Defendant's theory that the now outmoded surgical method utilized is to blame was disingenuous and misled the jury. Conclusive identification, regardless of which surgical method was employed, was required to meet the standard of care. That requirement was not met. Plaintiff did not press a motion for new trial based upon lack of informed consent, conceding that reasonable minds could have differed on that issue.
 Conclusion
In this Court's opinion, the verdict in favor of the defendant is not based on ample credible testimony and evidence. For the foregoing reasons, this Court finds that the verdict fails to respond to the evidence. Reasonable minds could not have come to the conclusion reached by the jury.
Accordingly, the plaintiff's motion for a new trial on the negligence count must be and is granted.
Counsel shall submit the appropriate order for entry.
[1] Dr. Moosa's prolific writings on the subject of laparoscopic cholecystectomy and the prevention of bile duct injuries lent support to his testimony on the stand. In A.R. Moosa, A. David Mayer and Bruce Stabile, Iatrogenic Injury to the Bile Duct, 125 Arch. Surg. 1028, 1029 (1990), Dr. Moosa wrote:
 "[t]he surgeon should be prepared for anatomic variations (anomalies) of the biliary tree in any patient. . . . Even in the presence of anomalous anatomy, bile duct injuries should not occur if the principles of safe cholecystectomy are adhered to." (Citations omitted.)
Dr. Moosa ended this article by quoting Grey-Turner who, nearly half a century before, wrote:
 "[i]njuries to the main duct are nearly always the result of misadventures during operation and are therefore a serious reproach to the surgical profession. They cannot be regarded as just an ordinary risk." Id. at 1030.
[2] See David B. Adams, The Importance of Extrahepatic Biliary Anatomy in Preventing Complications at Laparoscopic Cholecystectomy, 73 Surgical Anatomy and Embryology 861, 862 (1993). Adams wrote that:
 "[t]he Achilles heel of laparoscopic cholecystectomy, injury to the common bile duct, can be avoided in most instances by recognizing normal ductal anatomy and its variations and by applying sound laparoscopic techniques."
In addition, he stated that:
 "[t]here is no `normal anatomy' of the extrahepatic biliary tract. A common pattern of variations exist, and it is the surgeon's duty to be familiar with and recognize those normal variations when present. What Maingot said for open cholecystectomy is true for laparoscopic cholecystectomy: The surgeon `should work by sight and not by faith.'" Id. at 869. (Citations omitted.)
See also, John G. Hunter, Avoidance of Bile Duct Injury During Laparoscopic Cholecystectomy, 162 American Journal of Surgery 71, 75 (1991), wherein the author wrote that:
 "Step 4 is arguably the most important step in preventing CBD [common bile duct] injury. No clip should be placed on, and no incision should be made in, any structure until the transition between cystic duct and gallbladder infundibulum is clearly visualized. It is not adequate to see the cystic duct `entering' the gallbladder as this may belie a tented CBD coursing behind the gallbladder, drawn up by chronic inflammation."
[3] Steven M. Strasberg, Martin Hertl, and Nathaniel J. Soper, An Analysis of the Problem of Biliary Injury During Laparoscopic Cholecystectomy, 180 J. of Am. C. of Surgeons 101, 112-113 (1995).
[4] Id. at 113.
[5] Id.
[6] Steven M. Strasberg, Christopher J. Eagon, Jeffery A. Drebin, The "Hidden Cystic Duct" Syndrome and the Infundibular Technique of Laparoscopic Cholecystectomy — the Danger of the False Infundibulum, 191 J. of Am. C. Surgeons 661, 661 (2000) (Citation omitted.).