OPINION Justice Indeglia, for the Court. The defendants, Michael Y. Baaklini, M.D. (Dr. Baaklini or defendant) and Ce-darz Medical and Cosmedics, Inc. (Ce-darz), appeal a Superior Court trial justice’s grant of a motion for new trial in favor of the plaintiff, Stacia Aptt (Aptt), following a Providence County jury verdict in favor of the defendants. This matter came before the Supreme Court on December 7, 2017, pursuant to an order directing the parties to appear and show cause why the issues raised should not be summarily decided. After considering the arguments set forth in the parties’ memo-randa and at oral argument, we are convinced that cause has not been shown. Thus, further argument or briefing is not required to decide this matter. For the reasons outlined below, the Superior Court’s judgment is vacated, and the case is remanded with instructions to reinstate the jury’s verdict. I Facts and Travel The plaintiffs alleged injury arose during her visit to Dr. Baaklini on May 29, 2012. Aptt had been his patient since 2010, generally seeing him in his North Providence satellite office, although she had visited him a few' times at his main office- in Bristol as well. Each month,- she scheduled an appointment with him to reassess her neck and back pain, for' which he prescribed pain medication. Prior to May 29, she had no complaints about him. On that day, Aptt visited Dr. Baaklini at his North Providence office for her monthly appointment. Aptt had called to schedule an appointment for later in the week, but' the receptionist informed her that Dr. Baaklini could see her that dáy. Aptt arrived at the scheduled time, and Dr. Baak-lini led her to his office. There, she alleged that Dr. Baaklini told her, relying on the results of a blood test in her file, “I don’t know what to tell you[,] but your kidneys are gone, not one but two.” At trial, Aptt testified that' she had never had any problems with her kidneys, so she asked him repeatedly — “about ten times” — whether he was sure. ’ She recalled that he was “kind of like getting upset with me because I kept on [asking if he was sure). .He said, blood work don’t lie, blood work don’t lie, that’s what your blood results say * * He handed her tissues, because she had started crying, telling her that while she could live without one, she could not live without two kidneys. She testified that “right away * * * [she began] thinking [she was] going to die.” She questioned how her kidneys could be damaged, and he attributed it to her having taken medication for an extended period of time. She responded that she thought the medication was safe, in response to which Dr. Baaklini looked at her, shrugged his shoulders, and got up with his folder. Aptt’s .daughter, who had accompanied Aptt to the appointment, testified that her mother was crying when she left Dr. Baaklini’s office. Doctor Baaklini instructed Aptt to make an ultrasound appointment in a .different office in the building, which he testified was not part of Ce'darz, and also requested additional blood work. Still crying,- Aptt made the appointment for the following morning, and the receptionist provided her with accompanying paperwork. Without reviewing them, Aptt stored the papers in the visor of her car. Aptt testified that she cried on the way home, having a self-described “nervous breakdown.” Aptt’s daughter similarly recalled that her mother would not speak, in the car. Aptt remembered that her stomach was “in knots” and she “couldn’t talk,” nor. could she eat or sleep that night; in sum, her night “was misery.”[1] The next morning, Aptt felt “a tiny bit better.” She looked at the paperwork to check the time of her appointment, and she realized that it bore someone else’s name. She questioned, then, whether, the - office gave her the wrong paperwork, Aptt called Cedarz’s Bristol office. After giving her name, Aptt asked the receptionist to review her blood work. The receptionist obliged, concluding that all was normal. Aptt relayed what Dr. Baaklini had told her the previous day regarding her kidneys, including her belief that she was going to die, to which the receptionist laughed, Aptt hung up, and, although she was relieved, she" “thought about it for days.” Following' her realization that Dr. Baaklini was mistaken, she “couldn’t really talk.” Aptt testified that neither Dr. Baak-lini nor anyone else in his office ever contacted her to apologize. She never again returned to his office because she “didn’t trust him.” When he testified, Dr. Baaklini painted a vastly different picture of Aptt’s May 29 appointment. At the outset, he explained that patient files were not kept in the North Providence office,, but, instead, were transported from Bristol to North Providence when a patient was to be seen there. He further testified that, when a walk-in patient, such as. Aptt, came'to the North Providence office, a temporary chart was created for that'person. Doctor Baaklini testified that,' on that day, he examined Aptt as.a walk-in patient after she told- him that she was in pain. Although he admitted to having read to Aptt the blood test of another patient,[2] Dr. Baaklini said that he did not tell her that she had a kidney problem. Instead, Dr. Baaklini said that the blood test results revealed only a minor abnormality; the abnormality did not warrant her belief that she had a terminal condition, nor did it concern him. He opined to her that she might have a kidney stone. Doctor Baaklini testified that, during the appointment, Aptt became upset only when she realized that he would not prescribe her pain medication that day. Doctor Baaklini denied the accuracy of Aptt’s testimony that she never had a kidney infection and that she had asked him whether he was sure about the results. He also testified that he spoke with her over the phone on May 30, apologizing and admitting that he had mistakenly read to her someone else’s lab results. He remembered that she was not upset about the results during their phone call, and instead was upset that she was without pain medication. In an office note authored by Dr. Baaklini on May 30, he wrote that he had apologized to Aptt, telling her that the inclusion of the lab results in her file was not intentional, and that she had accepted his apology. Aptt filed an action in Rhode Island District Court alleging, albeit indirectly, that Dr. Baaklini negligently inflicted emotional distress upon her based on his misdiagnosis. A District Court judge granted defendants’ motion for summary judgment, a decision Aptt then appealed to Superior Court. A Superior Court justice denied defendants’ motion for summary judgment, and the case proceeded to trial. At the close of all evidence, defendants moved for a “directed verdict,” now referred to as a motion for judgment as a matter of law, but the Superior Court trial justice denied the motion. After deliberating, the jury returned a verdict for defendants, concluding that, while Dr. Baaklini was negligent, his negligence was not the proximate cause of Aptt’s injury. Because the jury concluded that there was no proximate cause, it did not reach the issue of damages.[3] Following the jury’s verdict, plaintiff moved for a new trial solely on the issue of damages. The trial justice considered the evidence, commenting that, while Aptt was “hysterical in. her testimony,” he found her credible. The trial justice also relayed that he had “some concern” as to Dr. Baaklini’s testimony, finding that it “made no sense * * * that this, was just a simple mistake.” He said there was “no way” that there would be a blood test in a temporary file, and questioned Dr. Baaklini’s failure to ask why it was included. Continuing, the trial justice also found Dr. Baaklini incredible as to his testimony that, while he apologized to Aptt the next day, she was not upset. Stating that “[i]t doesn’t make sense[,] [especially judging her emotional state as a witness,” the trial justice speculated that the jury may have disliked her due to her hyperemotional antics during trial. Nevertheless, he determined that “that doesn’t go towards her credibility, that goes towards her personality.” The trial justice ultimately concluded that the jury’s verdict was wrong, reasoning that it failed to respond to the merits of the controversy and to administer substantial justice. The trial justice offered defendants either a new trial on damages and on proximate cause, or an additur in the amount of $1,800. The defendants appealed pursuant to G.L. 1956 § 9-24-7, bringing the case properly before us. II Discussion A. Motion for New Trial 1. Standard of Review When we considér a trial justice’s decision granting or denying a motion for new trial, we apply deferential review. Bates-Bridgmon v. Heong’s Market, Inc., 152 A.3d 1137, 1143 (R.I. 2017). “A trial justice’s role in considering a motion for * * * new trial is that of a superju-ror, who must weigh the evidence and assess the credibility of the witnesses.” Id. (quoting Gomes v. Rosario, 79 A.3d 1262, 1265 (R.I. 2013)). After he or she does so, “the trial justice must uphold the jury verdict if he or she determines that the evidence is evenly balanced or is such that reasonable minds in considering the same evidence could come to different conclusions * * Id. at 1143-44 (quoting Free & Clear Co. v. Narragansett Bay Commission, 131 A.3d 1102, 1109 (R.I. 2016)). Alternatively, “when [the trial justice’s] judgment tells him that the verdict is wrong, because it fails to respond truly to the real merits of the controversy and to administer substantial justice, and is against the fair preponderance of the evidence, then his duty is to set aside the verdict.” Humes v. Schaller, 39 R.I. 519, 522, 99 A. 55, 57 (1916). Accordingly, “unless the moving party demonstrates that the trial justice overlooked or misconceived material and relevant evidence or was otherwise clearly wrong,” we will not disturb the ruling. Bates-Bridgmon, 152 A.3d at 1144 (quoting Free & Clear Co., 131 A.3d at 1109). 2. Analysis “Under our practice a trial justice, in considering a motion for * * * new trial * * *, has the obligation of passing upon the evidence, the weight thereof, and the credibility of the witnesses in an exercise of his independent judgment thereon.” Ruggieri v. Beauregard, 110 R.I. 197, 199, 291 A.2d 413, 414 (1972). However, “it is the prerogative of the fact-finder to ‘pick and choose’ which testimony it deems to be believable, [and] * * * [t]he trial justice is not free to disregard the decision of the jurors simply because he would find different portions of the * * * testimony to be credible.” King v. Huntress, Inc., 94 A.3d 467, 496 n. 34 (R.I. 2014) (quoting Russian v. Lipet, 103 R.I. 461, 464, 238 A.2d 369, 371 (1968)). In granting plaintiffs motion for new trial, the trial justice explained that he did so because he found Aptt credible and Dr. Baaklini incredible. He outlined Aptt’s alleged damages, including lost sleep, lost appetite, and a “miserable night,” during which she felt that she “suffered an incredible amount.” He took issue with Dr. Baak-lini’s testimony that his reading of these blood results was a “simple mistake.” Moreover, he questioned how Dr. Baaklini could have apologized to Aptt without acknowledging that she was upset. The defendants counter that it was reasonable for the jury to find Aptt incredible, and thus the trial justice should not have disturbed the verdict.[4] We agree. Our review of the record reveals that, in issuing his decision, the trial justice spoke solely of his discernment of the witnesses’ credibility. While we have previously upheld a trial justice’s decision granting a motion for new trial where he unequivocally and emphatically “ma[de] it quite clear in his decision -that he was firmly convinced the evidence was gravely lacking in any support * * Kasegian v. Mottram, 95 R.I. 183, 185, 185 A.2d 450, 452 (1962), the trial justice here did not ground his decision in “gravely lacking” evidence. Instead, he only expressed his own disagreement with the jury’s credibility determination. Id.; but see Pawtucket Redevelopment Agency v. Brown, 106 A.3d 893, 901 (R.I. 2014) (upholding the trial justice’s grant of new trial where the trial justice determined “that the jury award on [the] defendant’s counterclaim had ‘no rational basis in the evidence whatsoever’ ”). As such, we cannot fairly say that reasonable minds could not have differed as to the disposition of this case.[5] Kasegian, 95 R.I. at 185, 185 A.2d at 452 (“When the evidence is- such ‘that different minds would naturally and fairly come to different conclusions thereon, [the trial justice] has no right to disturb the findings of the jury, although his own judgment might incline him the other way[.]’” (quoting Humes, 39 R.I. at 522, -99 A. at 57)). Moreover, although not decisive, we highlight that, in denying defendants’ motion for judgment as a matter of law at the close of all evidence, the trial justice stated the following: “I believe [this] is a classic case of two people who have a different memory of what transpired on a particular day * * * I think [the jury] * * * understand[s] what transpired is really a. question of who they believe, not who I believe, it’s who they believe.” There, the trial justice fairly summarized the nub of the evidence presented in this case — diametrically opposed testimony of the parties. Based on our examination of the record, we conclude that reasonable minds could differ as to the credibility of those parties. A trial justice cannot “merely sub-stitutef ] his judgment for that of the jury which was equally reasonable,” and, if he does so, that decision must be set aside. Kasegian, 95 R.I. at 185, 185 A.2d at 452. Thus, we conclude that the trial justice clearly erred by replacing the jury’s determination with his own, despite the fact that either conclusion was reasonable. See id[6] III Conclusion For the reasons set forth in this opinion, we vacate the trial justice’s grant of the plaintiffs motion for new trial, The case is remanded to Superior Court with instructions to reinstate the jury’s verdict. Justice Goldberg did not participate. . On cross-examination, defense counsel brought to light that Aptt had previously had an issue with insomnia, for which she had received medical attention. Moreover, Dr. Baaklini testified that he had prescribed a medication for her that- is uséd primarily for sleeping issues, although he-'conceded that he was not sure what caused her not to sleep that particular night. He also testified that he had previously thought that Aptt may have suffered from anxiety or depression. . Doctor Baaklini recalled that he did not realize that the blood report contained the name of a patient other than Aptt because the report was attached to Aptt’s temporary file in a way that covered the other patient's name. . The jury’s verdict sheet informed the jury that, if it answered in the affirmative on the question of Dr. Baaklini’s negligence, it should move to the second question of whether his negligence was the. proximate cause of Aptt's injury. Because it answered negatively as to proximate cause, it was instructed not to move on to the damages question. . While defendants did not argue this point in their papers, the record reveals that the trial justice ruled sua sponte in granting plaintiff a new trial on the issue of proximate cause where plaintiff only so moved on the issue of damages. However, because defendants did not raise this argument, we do not address it. See Bowen Court Associates v. Ernst & Young, LLP, 818 A.2d 721, 728 (R.I. 2003) ("We have repeatedly held, consistent with Article I, Rule 16(a) of the Supreme Court Rules of Appellate Procedure, that a party’s failure to include a particular issue in his, her, or its brief on appeal results in a waiver of that issue.”). . The trial justice ended his motion for new trial determination by stating that Aptt’s inappropriate behavior during trial does not reflect her credibility, and instead was only a reflection of her personality. As an aside, we. remind that a jury's consideration of a witness’s perceived personality traits is proper in weighing that witness’s: credibility. See State v. Whitfield, 93 A.3d 1011, 1021, 1021 n. 7 (R.I. 2014) (noting it is common for trial justices to tell the jury that it may consider the appearance, conduct, and demeanor of a testifying witness when assessing his ór her credibility). . We also hold that the trial justice erred in offering defendants the choice of an additur . where the jury did not return a verdict for plaintiff, an error that plaintiff’s counsel conceded at oral argument. See Cotrona v. Johnson & Wales College, 501 A.2d 728, 733 (R.I. 1985) ("Traditionally, ⅛ ⅜ * additur[s] have been used to correct jury awards * * ⅜.”) (emphasis added): see also Gomes v. Rosario, 79 A.3d 1262; 1263 n. 2 (R.I. 2013) (“The trial justice also denied [the] plaintiff’s motion for . additur because the jury found in. favor of [the] defendant and therefore awarded no damages to which an additur could attach.”).