June 9, 2021

**Supreme Court**

No. 2018-242-Appeal.
(WC 13-384)

Pamela Joplin, Individually and in her    :
capacity as Executrix of the Estate of
Patricia A. Kinney, et al.    :

v.    :

Kathleen A. Cassin, M.D.    :

NOTICE: This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone (401) 222-3258 or Email opinionanalyst@courts.ri.gov, of any typographical or other formal errors in order that corrections may be made before the opinion is published.

Pamela Joplin, Individually and in her   :
capacity as Executrix of the Estate of
Patricia A. Kinney, et al.   :

v.   :

Kathleen A. Cassin, M.D.   :

Present: Suttell, C.J., Flaherty, and Robinson, JJ.

## O P I N I O N

**Chief Justice Suttell, for the Court.** The defendant, Kathleen A. Cassin, M.D. (Dr. Cassin or defendant), appeals from a Superior Court order granting a motion for a new trial in favor of the plaintiff, Pamela Joplin (Mrs. Joplin or plaintiff).[1] This medical malpractice action arises out of the death of Patricia A. Kinney, who lost her battle with ovarian cancer in 2014. Following six days of trial testimony and four days of deliberation, a jury found that Dr. Cassin breached the duty of care owed to Mrs. Kinney, but that this breach was not the proximate cause of Mrs. Kinney's death. The trial justice granted plaintiff's motion for a new trial, however, finding that the jury's verdict was against the fair preponderance of the

---

[1] Mrs. Joplin brought this action individually and in her capacity as executrix of the estate of Patricia A. Kinney and on behalf of her siblings Michelle Kinney, Donald Kinney, and Jason Kinney.

evidence and failed to do substantial justice. For the reasons set forth in this opinion, we vacate the Superior Court's order, and we remand the case with instructions to reinstate the jury's verdict.

## I

### Facts and Travel

In early 2011, Mrs. Kinney began experiencing dizziness and shortness of breath while engaging in normal daily activities, such as walking short distances. After conducting her own evaluation, Mrs. Kinney's primary care physician, Gloria Sun, M.D., referred Mrs. Kinney to James Smythe, M.D., a hematologist/oncologist. Doctor Smythe ordered various tests for Mrs. Kinney, including a computerized tomography (CT) scan of her chest, abdomen, and pelvis. Among other things, the CT scan revealed a complex pelvic mass on the left adnexa, which was likely ovarian-related. In response to this finding, Dr. Smythe ordered a pelvic ultrasound, which confirmed the presence of a left adnexal mass[2] that was predominantly cystic. Doctor Smythe reviewed his findings with Mrs. Kinney and referred her to Dr. Cassin for further gynecological evaluation.

Doctor Cassin is a board-certified obstetrician-gynecologist who has since 2004 limited her practice to gynecology—the surgical and medical care of women's

---

[2] Throughout trial, the terms "adnexal mass" and "ovarian mass" were used interchangeably. Given that the term "adnexal mass" is consistently used throughout Mrs. Kinney's medical records, we will use the term "adnexal mass" in this opinion.

reproductive organs. Mrs. Kinney had previously sought treatment from Dr. Cassin in the 1990s and early 2000s. In 1993, Dr. Cassin performed a total abdominal hysterectomy and removed Mrs. Kinney's left fallopian tube and left ovary due to endometriosis.[3]

On June 13, 2011, Mrs. Kinney visited Dr. Cassin's office for an initial consultation regarding the adnexal mass. In preparation for Mrs. Kinney's visit, Dr. Cassin reviewed the CT scan and pelvic ultrasound report. During the visit, Dr. Cassin performed a physical exam of Mrs. Kinney's pelvis and documented that an approximately five-centimeter firm, moderately tender mass was felt. In Mrs. Kinney's chart, Dr. Cassin noted that she suspected the mass was an "endometrioma in remnant or implant."[4] Additionally, she noted that she had discussed the options of close follow-up with imaging versus surgery for a definitive diagnosis and that Mrs. Kinney had opted for surgery. Directly next to this note, Dr. Cassin also indicated that Mrs. Kinney's sister had died of ovarian cancer. Finally, Dr. Cassin recorded her treatment plan—Mrs. Kinney was to have a preoperative office visit on July 5, 2011, followed by surgery.

---

[3] Mrs. Kinney suffered from severe endometriosis. Prior to 1993, a colleague of Dr. Cassin's performed surgery to remove Mrs. Kinney's right ovary and fallopian tube.
[4] An endometrioma is a "mass of endometrial tissue" that is out of place within the body. Stedman's Medical Dictionary 641 (28th ed. 2006); Stedman's Medical Dictionary 611 (28th ed. 2006) (defining "ectopic" as "[o]ut of place[.]").

On July 13, 2011, Dr. Cassin operated on Mrs. Kinney at South County Hospital. Initially, Dr. Cassin attempted to remove the adnexal mass in one piece; however, a portion of the mass was adhered to the ureter. Doctor Cassin suctioned out the fluid contents of the mass, samples of which were later sent to the pathology department for analysis. Then, Dr. Cassin removed tissue samples from the mass, known as frozen sections, and immediately sent them to the pathology department of South County Hospital for review. After completing his initial analysis of the frozen sections, the pathologist, James Carlsten, M.D., called the operating room to inform Dr. Cassin that his initial impression was that the mass was an endometrioma; however, he could not definitively rule out cancer. Doctor Cassin attempted to remove any remaining tissue that she could without damaging the ureter, but ultimately decided that there was a small piece of attached tissue that she could not safely remove. Prior to closing Mrs. Kinney's incision, Dr. Cassin inspected Mrs. Kinney's bowel and saw no signs of injury.

Following the completion of her surgery, Mrs. Kinney remained at South County Hospital for postsurgical observation. On July 14, 2011, while Mrs. Kinney was still admitted at South County Hospital, Dr. Cassin received a cytology report which indicated that the fluid collected from Mrs. Kinney's adnexal mass contained "[h]ighly atypical cells" that were "worrisome for a cystic neoplasm." Doctor Cassin understood this report to be an indication that Mrs. Kinney's mass may have

been ovarian cancer rather than an endometrioma. While the final pathology report for the frozen sections was still pending, Dr. Cassin also had a discussion with Dr. Carlsten, during which Dr. Carlsten indicated that he suspected that Mrs. Kinney's mass was in fact cancerous, despite the initial frozen sections having been suggestive of an endometrioma.

Mrs. Kinney was discharged from South County Hospital on July 17, 2011. Three days later, Mrs. Kinney visited Dr. Cassin's office to have her surgical staples removed. During this visit, Dr. Cassin documented that Mrs. Kinney's incision looked good and that Mrs. Kinney was aware that the final pathology report was still pending. Doctor Cassin also scheduled a follow-up visit with Mrs. Kinney for the following week.

However, the next morning, Mrs. Kinney called Dr. Cassin to report that she was experiencing "copious wound drainage[.]" Doctor Cassin suspected that Mrs. Kinney might have a fistula[5] and arranged to have her admitted to South County Hospital. At 10:15 a.m. on July 21, 2011, Allison McAteer, M.D., a general surgeon, admitted Mrs. Kinney to the hospital and discussed her care plan with Dr. Cassin. Later that same day, Dr. Cassin learned that the final pathology report indicated that Mrs. Kinney had clear cell adenocarcinoma, a rare form of ovarian cancer.

---

[5] During trial, a "fistula" was described as a hole in the bowel that allows contents from the intestine to leak into the abdominal cavity.

From July 21, 2011, to August 8, 2011, Mrs. Kinney remained at South County Hospital receiving treatment for her fistula. Although Dr. Cassin was not the admitting physician, she continued to visit Mrs. Kinney during her hospital stay. In addition to visiting Mrs. Kinney, Dr. Cassin also attended a meeting of the South County Hospital tumor board on August 2, 2011; her notes from this meeting indicate that the proposed care plan included starting chemotherapy once Mrs. Kinney was well enough to tolerate the treatment, as well as the possibility of a second surgery to remove the tumor. On August 31, 2011, Dr. McAteer informed Dr. Cassin that Mrs. Kinney would be transferred to Roger Williams General Hospital for further evaluation and possible surgery to repair the fistula, to be performed by Joseph Espat, M.D., a gastrointestinal oncologist.

On September 1, 2011, Dr. Cassin spoke to Dr. Espat and discussed Dr. Espat's care plan for Mrs. Kinney; she noted that Dr. Espat planned to perform surgery followed by chemotherapy to treat Mrs. Kinney's ovarian cancer. In addition, Dr. Cassin told Dr. Espat that she believed that Mrs. Kinney had residual tumor in her left lower quadrant. On September 7, 2011, Dr. Espat operated on Mrs. Kinney. After completing Mrs. Kinney's surgery, Dr. Espat informed Dr. Cassin that he "found no left lower quadrant mass" during the operation.

According to Dr. Cassin's notes, Dr. Cassin remained in contact with Mrs. Kinney through December 2, 2011. During this time, Mrs. Kinney was treated by

several doctors, including Dr. McAteer, Dr. Sun, Dr. Smythe, and Dr. Espat; however, no additional surgery was performed to assess or treat Mrs. Kinney's ovarian cancer. In early 2012, CT scans revealed the presence of a four-centimeter complex mass in Mrs. Kinney's left adnexa. By April 2012, Mrs. Kinney's cancer was classified as metastatic, meaning that it had spread to other parts of her body. Mrs. Kinney died of ovarian cancer on November 25, 2014.

Prior to her death, Mrs. Kinney filed this civil action alleging that Dr. Cassin negligently performed a surgical procedure. Following Mrs. Kinney's death, the complaint was amended to reflect that Mrs. Kinney's daughter, Pamela Joplin, had been substituted as the representative of Mrs. Kinney's estate and to allege that Dr. Cassin

> "negligently performed a surgical procedure and post-surgical follow-up, which failed to entirely remove or arrange to remove or have others remove cancerous tissue, failed to consult experts in oncology, resulted in the development of a fistula and led to several other complications and damage to organs, thereby causing Patricia A. Kinney to suffer and become afflicted with grave and severe personal injuries, extreme pain and suffering, and death."[6]

---

[6] The plaintiff's complaint also asserted claims against Dr. McAteer, South County Hospital, and South County Hospital Healthcare System d/b/a South County Hospital Center for Women's Health. However, those claims were dismissed with prejudice on March 15, 2016.

At trial, plaintiff argued that the standard of care required Dr. Cassin to refer Mrs. Kinney to a gynecologic oncologist prior to the July 13, 2011 surgery, because Mrs. Kinney had presented with multiple ovarian cancer risk factors. The plaintiff's expert witness, Julian Schink, M.D., testified that, if Mrs. Kinney's surgery had been performed by a gynecologic oncologist, the entire mass would have been removed, thus eliminating Mrs. Kinney's cancer, and Mrs. Kinney likely would not have developed a fistula. Additionally, plaintiff's expert witness testified that the postsurgery standard of care required Dr. Cassin to refer Mrs. Kinney to a gynecologic oncologist after the surgical pathology reports indicated that Mrs. Kinney's mass was cancerous.

Conversely, Dr. Cassin testified that she was not required to refer Mrs. Kinney to a gynecologic oncologist for the initial surgery because Mrs. Kinney's medical history indicated that the mass was likely an endometrioma. Additionally, Dr. Cassin testified that she had offered Mrs. Kinney the option of referral to a gynecologic oncologist during her initial consultation, but Mrs. Kinney had elected to have Dr. Cassin perform the surgery.

The defendant's expert witness, Mary Susan Schilling, M.D., testified that Dr. Cassin met the standard of care before, during, and after surgery. In support of this position, Dr. Schilling testified that the intraoperative pathology report indicated that the mass was consistent with an endometrioma and that, therefore, it was reasonable

for Dr. Cassin to rely upon those results. With regard to postsurgery care, Dr. Schilling explained that, when Dr. Cassin learned that Mrs. Kinney did in fact have cancer, Mrs. Kinney had already been admitted to South County Hospital under the care of Dr. McAteer. Further, Dr. Schilling testified that, in July and August 2011, Dr. Smythe, a medical oncologist, and Dr. Espat, a surgical oncologist, were both involved in Mrs. Kinney's care.

At the close of the evidence, the jury returned a verdict in favor of plaintiff on the issue of negligence and for Dr. Cassin on the issue of proximate cause. The plaintiff filed a timely motion for a new trial, arguing that the jury's finding on causation was unsupported by the evidence and failed to do substantial justice between the parties.[7] The defendant argued in opposition to the motion that there were plausible interpretations of the evidence from which the jury could have found that Dr. Cassin breached her duty of care but that said breach was not the proximate cause of Mrs. Kinney's death.

On May 25, 2018, a hearing was held at which the parties were given the opportunity to present their arguments with respect to the motion for a new trial; however, both parties elected to rest on their memoranda. The trial justice then

---

[7] The plaintiff requested a new trial limited to the issues of causation and damages. The trial justice, however, concluded that a retrial on the issue of causation and damages alone would create substantial prejudice to defendant and might result in jury confusion.

issued a decision from the bench, wherein she explained that the "crux of this controversy" was whether Dr. Cassin was required to involve a gynecologic oncologist in Mrs. Kinney's care. Based on her review of the record, the trial justice held that "[t]he finding of fault without a finding of causation [was] illogical and not based upon the credible evidence." Further, she stated, "[h]ere, liability and proximate cause are completely interwoven and make it logically impossible to find fault without proximate cause."

Thus, the trial justice granted plaintiff's motion for a new trial. An order to that effect was entered on June 11, 2018. Doctor Cassin filed a timely appeal, bringing this case properly before us.

## II

### Standard of Review

This Court affords "great weight" to a trial justice's ruling on a motion for a new trial. *Manning v. Bellafiore*, 991 A.2d 399, 408 (R.I. 2010) (quoting *Bajakian v. Erinakes*, 880 A.2d 843, 852 (R.I. 2005)). "When ruling on a motion for a new trial, the trial justice acts as a superjuror and should review the evidence and exercise his or her independent judgment in passing upon the weight of the evidence and the credibility of the witnesses." *Id.* (quoting *Seddon v. Duke*, 884 A.2d 413, 413 (R.I. 2005) (mem.)). After doing so, "the trial justice must uphold the jury verdict if [the justice] determines that the evidence is evenly balanced or is such that reasonable

- 10 -

minds in considering the same evidence could come to different conclusions." *Aptt v. Cedarz Medical and Cosmedics, Inc.*, 175 A.3d 484, 488 (R.I. 2018) (deletion omitted) (quoting *Bates-Bridgmon v. Heong's Market, Inc.*, 152 A.3d 1137, 1143 (R.I. 2017)). However, a "trial justice may set aside a verdict when [the justice's] judgment tells him or her that it is wrong because it fails to respond truly to the merits of the controversy and to administer substantial justice and is against the fair preponderance of the evidence." *Manning*, 991 A.2d at 408 (brackets omitted) (quoting *Murray v. Bromley*, 945 A.2d 330, 333 (R.I. 2008)). Accordingly, "this Court will affirm a trial justice's decision on a motion for a new trial as long as the trial justice conducts the appropriate analysis, does not overlook or misconceive material evidence, and is not otherwise clearly wrong." *Id.* (quoting *Murray*, 945 A.2d at 334).

### III

### Discussion

On appeal, Dr. Cassin argues that the trial justice erred in granting plaintiff's motion for a new trial because "reasonable minds could come to different conclusions about proximate causation when considering the evidence in this case." Doctor Cassin contends that plaintiff advanced three distinct theories of breach during trial—the presurgery failure to refer Mrs. Kinney to a gynecologic oncologist; the performance of the surgery; and the postsurgery failure to refer Mrs. Kinney to

a gynecologic oncologist—and that the jury's determination that plaintiff did not satisfy her burden of proof with respect to causation was reasonable and supported by the evidence at trial. Moreover, Dr. Cassin argues that the trial justice improperly eliminated proximate cause as a separate and distinct element of negligence.

In granting plaintiff's motion for a new trial, the trial justice explained that "the determination of negligence by this jury necessitates a finding of causation based upon the credible evidence on this trial record." Further, she found that "[t]he only conclusion that should be drawn from the facts and the evidence is that but for Dr. Cassin's negligence, the plaintiff would have survived her cancer." In reaching that conclusion, the trial justice reasoned that "[t]he testimony of Dr. Cassin as well as the uncontradicted credible testimony of Dr. Schink establishes that if the standard of care had been met and a [gynecologic] oncologist performed the surgery, Patricia Kinney would have been cured because the mass would have been removed."

Additionally, the trial justice found that the credible trial evidence established that Mrs. Kinney was at a high risk of having ovarian cancer when she initially presented to Dr. Cassin. She also noted that, during Dr. Cassin's testimony, the doctor had acknowledged "the precarious nature of the surgery" and the risks involved. Moreover, the trial justice noted that Dr. Cassin "confirmed that patients who have ovarian cancer and who are operated on by a [gynecologic] oncologist have greater survival rates."

- 12 -

"While a trial justice need not reference all of the evidence elicited at trial, [the trial justice] is required to reference enough for this Court to be satisfied that [the justice] applied the correct standard." *King v. Huntress, Inc.*, 94 A.3d 467, 493 (R.I. 2014). Our review of the record indicates that, in the course of ruling on plaintiff's motion for a new trial, the trial justice discussed only the testimony of Dr. Schink and Dr. Cassin. Moreover, the decision contained no reference to the testimony of Dr. Schilling, nor did it address the multiple theories of breach of duty that were presented at trial. Accordingly, "the trial justice failed to reference enough evidence for this Court to be satisfied that [she] applied the correct standard." *King*, 94 A.3d at 493.

For the purposes of our review, we are concerned neither with the credibility of the expert witnesses nor with the weight of their testimony. These functions are properly assigned to the jury in the first instance and to the trial justice in assessing the motion for a new trial. When the trial justice overlooks or misconceives material evidence, however, we are tasked with reviewing the evidence "in the light most favorable to the prevailing party" to determine "if there is any competent evidence to support the jury's verdict[.]" *Marcotte v. Harrison*, 443 A.2d 1225, 1232 (R.I. 1982).

In the case under review, the record clearly demonstrates that plaintiff advanced multiple theories of breach of duty. The crux of plaintiff's cause of action

was that Dr. Cassin failed to refer Mrs. Kinney to a gynecologic oncologist at various stages of her treatment. Doctor Schink testified that Mrs. Kinney was at high risk for ovarian cancer and that the standard of care required Dr. Cassin to refer her to a gynecologic oncologist before the surgery on July 13, 2011. This was because a gynecologic oncologist, unlike a gynecologist such as Dr. Cassin, would have the training and experience to remove the entire mass. As Dr. Schink testified, "this is what gynecologic oncologists do day in and day out, take these masses out." Thus, he stated, Dr. Cassin's performance of the surgery on July 13, 2011, was a deviation from the standard of care. He did acknowledge on cross-examination, however, that Dr. Cassin engaged in the "appropriate medical practice" when she took frozen samples during the surgery, and he agreed that surgeons often rely on frozen section evaluations, as they have an accuracy rate ranging from "72 to 88" percent. Finally, Dr. Schink was of the opinion that the standard of care required consultation with a gynecologic oncologist on or after July 21, 2011, when Dr. Cassin received the final pathology report indicating clear cell adenocarcinoma of the ovary.

In contradistinction, defendant's expert witness, Dr. Schilling, testified that in her opinion Dr. Cassin met the appropriate standard of care before, during, and after the surgery. Doctor Schilling acknowledged that the results of imaging studies,

including a CT scan and an ultrasound, as well as a CA-125 test,[8] placed malignancy on the differential, "but it was not at the top of [Dr. Schilling's] differential." Nevertheless, she opined that, based largely on Mrs. Kinney's known history of endometriosis, Dr. Cassin was compliant with the standard of care. Specifically, Dr. Schilling testified that Dr. Cassin explained to Mrs. Kinney appropriate treatment options, including expectant management with close follow-up, exploratory laparotomy for the surgical removal of the mass, and referral to a tertiary medical center for further evaluation. According to Dr. Schilling, however, defendant was not required to refer her patient to a gynecologic oncologist.

With respect to the surgery itself, Dr. Schilling also testified that Dr. Cassin performed in compliance with the standard of care. Based upon her review of the medical records, Dr. Schilling explained that Dr. Cassin made "a very reasonable incision[,]" especially in light of Mrs. Kinney's known history of diabetes. Doctor Cassin then found "extensive adhesions" in her patient's abdomen and "a mass which very much looked like an endometrioma, which was her leading diagnosis." Doctor Schilling further testified that Dr. Cassin drained the mass of fluid and resected portions of the mass for analysis by the hospital's pathology department. The pathology report of those frozen sections indicated that the mass was consistent

---

[8] "CA-125" is the "[a]bbreviation for cancer antigen 125 and the test for it." Stedman's Medical Dictionary 285 (28th ed. 2006). As explained by Dr. Schink at trial, "CA-125 is a tumor marker" that "is commonly elevated in ovarian cancer[.]"

with, and most likely was, an endometrioma. Doctor Schilling testified that it was reasonable for Dr. Cassin to rely upon those results; although malignancy could not be ruled out, the frozen section is consistent with the final pathology 70 to 85 percent of the time. Doctor Schilling further opined that, in light of the frozen section analysis and the patient's medical history and "significant comorbidities," it was consistent with the standard of care for Dr. Cassin to not resect the entire mass, so as to not compromise the patient's ureter.

As for Dr. Cassin's conduct after she received the final pathology report on July 21, 2011, Dr. Schilling was never directly asked whether that conduct met the standard of care. She did testify, however, that at that time Mrs. Kinney had been readmitted to South County Hospital under the primary care of Dr. McAteer.

On the topic of causation, Dr. Schilling was neither asked nor did she offer any opinion. Nor did defendant present any other witness to testify concerning the proximate cause of Mrs. Kinney's death. On the other hand, Dr. Schink asserted that, if a gynecologic oncologist had performed the surgery, the cancer would have been cured and Mrs. Kinney would have survived. So too, he opined, if Mrs. Kinney had been referred to a gynecologic oncologist after the surgery, "[t]he patient would have been taken to the operating room, the mass would have been removed, and in all likelihood she would be alive today."

Doctor Schink also offered contradictory testimony, however, as set forth in the following exchange:

> "[PLAINTIFF'S COUNSEL:] What is it about ovarian cancer that makes it, as you've just described, the type of malignant disease that requires complete and total removal in the initial surgery? Why does that make such a big difference on patient survival?
>
> "[DR. SCHINK:] Well, there are a number of factors. One, the most important component to curing cancer is surgery, is the surgical removal of the disease. With Stage 1 disease, it's usually completely resected just by the surgery. That in and of itself in Stage 1 disease cures 70 percent of patients. Furthermore, while it's relatively chemo responsive, in other words, we can shrink these cancers with chemotherapy, the smaller the volume of cancer, the better our chance that that chemotherapy will completely cure it. And it's really tied to the size of the cancer that's left behind. And it was established in the early 1980s, late '70s at Harvard by Tom Griffiths that if you leave a tumor bigger than two centimeters behind, that patient can't be cured."

According to Dr. Schink, a CT scan conducted thirteen days after the surgery revealed a mass almost four centimeters in size, representing about 60 percent of the mass before the surgery.

The jury verdict form contained two questions submitted to the jury regarding negligence and proximate cause. The first was, "Do you find that the [p]laintiffs have proven by a preponderance of the evidence that the [d]efendant Kathleen Cassin, M.D. was negligent?"; the jury responded, "Yes." And, the second was,

- 17 -

"Was the negligence of Dr. Cassin a proximate cause of Patricia Kinney's death from ovarian cancer?"; the jury answered in the negative.

Thus, the record does not delineate upon what basis the jury found Dr. Cassin negligent. The jury may have found that defendant acted consistently with the standard of care before and during the surgery on July 13, 2011, but was negligent in her postsurgery care. The testimony of Dr. Schink is instructive in this regard:

> "[PLAINTIFF'S COUNSEL:] Do you have an opinion to a reasonable degree of medical probability and certainty as to what the standard of care required of Dr. Cassin as soon as she learned that the mass that was left behind was cancerous? Do you have an opinion as to what the standard of care required?
>
> "[DR. SCHINK:] Yes.
>
> "[PLAINTIFF'S COUNSEL:] What did it require?
>
> "[DR. SCHINK:] Consultation with a gynecologic oncologist."

Viewing the entirety of the evidence, therefore, in the light most favorable to Dr. Cassin, the prevailing party, we conclude that there is competent evidence to support a conclusion that Dr. Cassin's negligence was her failure to refer Mrs. Kinney to a gynecologic oncologist after July 21, 2011, when the final pathology report definitively determined that Mrs. Kinney suffered from ovarian cancer, yet such negligence was not a proximate cause of her death because by that point in time Mrs. Kinney's cancer was incurable.

Our review of the record reveals that the trial justice overlooked material evidence in concluding that "liability and proximate cause are completely interwoven" in this case. "In malpractice suits where the negligence complained of consists of an act of omission, as in the instant case, causation is frequently difficult to ascertain and prove." *Gianquitti v. Atwood Medical Associates, Ltd.*, 973 A.2d 580, 593 (R.I. 2009) (quoting *Schenck v. Roger Williams General Hospital*, 119 R.I. 510, 517, 382 A.2d 514, 518 (1977)). However, despite the difficulty of ascertaining causation, the plaintiff still bears the burden of establishing "that there was a causal relation between the act or omission of the defendant and the injury to the plaintiff." *Schenck*, 119 R.I. at 514, 382 A.2d at 516-17.

During this complex medical-malpractice trial, the jury heard conflicting evidence regarding whether Dr. Cassin had breached her duty of care before, during, or after the July 13, 2011 surgery. Moreover, the jury also heard evidence that Mrs. Kinney was actively being treated by other doctors during the time of each alleged breach. While plaintiff presented multiple theories regarding the allegation that Dr. Cassin had breached the standard of care, the trial justice's new-trial decision considered only whether Mrs. Kinney would have been cured of her cancer if a gynecologic oncologist had performed the initial surgery.

The trial justice failed to discuss, much less consider, the testimony of Dr. Schilling, or to allow for the possibility that the jury might credit Dr. Schilling's

opinion that Dr. Cassin performed the surgery in accordance with the standard of care, but, nevertheless, might also conclude that she was negligent in her postoperative treatment by not referring Mrs. Kinney to a gynecologic oncologist to remove the portion of the mass that Dr. Cassin had left behind. As a result, the trial justice did not consider Dr. Schink's testimony that the mass left behind was approximately four centimeters and that "if you leave a tumor bigger than two centimeters behind, that patient can't be cured."

"A trial justice cannot 'merely substitute his [or her] judgment for that of the jury which was equally reasonable,' and if [the trial justice] does so, that decision must be set aside." *Aptt*, 175 A.3d at 489 (brackets omitted) (quoting *Kasegian v. Mottram*, 95 R.I. 183, 185, 185 A.2d 450, 452 (1962)).

> "It is the jury, not the court, which is the fact-finding body. It weighs the contradictory evidence and inferences, judges the credibility of witnesses, receives expert instructions, and draws the ultimate conclusion as to the facts. The very essence of its function is to select from among conflicting inferences and conclusions that which it considers most reasonable. * * * That conclusion, whether it relates to negligence, causation or any other factual matter, cannot be ignored. Courts are not free to reweigh the evidence and set aside the jury verdict merely because the jury could have drawn different inferences or conclusions or because judges feel that other results are more reasonable." *Tennant v. Peoria & P.U. Ry. Co.*, 321 U.S. 29, 35 (1944).

Given the evidence presented in this case, it is our opinion that reasonable minds in considering such evidence could have come to different conclusions on the

question of whether the plaintiff had met her burden of establishing that Dr. Cassin's breach was the cause of Mrs. Kinney's death. *See Schenck*, 119 R.I. at 514, 382 A.2d at 516-17. Accordingly, we conclude that the trial justice erred by replacing the jury's determination with her own. *See Aptt*, 175 A.3d at 489.

## IV

## Conclusion

For the reasons set forth in this opinion, we vacate the order of the Superior Court. The case is remanded to the Superior Court with instructions to reinstate the jury's verdict and enter judgment in accordance with that verdict.

Justice Goldberg, Justice Lynch Prata, and Justice Long did not participate.

Justice Flaherty participated in the decision and authored the concurring and dissenting opinion but retired prior to its publication.

**Justice Flaherty, concurring and dissenting.** I can accept and will concur with the majority's opinion that the trial justice erred when she concluded that "liability and proximate cause [were] completely interwoven" and that, in doing so, she conflated the breach and causation elements of negligence. However, it is my opinion that this case should be remanded to the Superior Court for a rehearing on the plaintiff's motion for a new trial, with instructions to the trial justice to consider causation in light of the multiple theories of liability advanced by the plaintiff.

- 21 -

The majority succinctly concludes that there was competent evidence to support a finding that Dr. Cassin's negligence was her postsurgery failure to refer Mrs. Kinney to a gynecologic oncologist, but that such negligence was not a proximate cause of Mrs. Kinney's death. This is so, the majority reasons, because by that point in time her cancer was incurable. It is apparently the majority's rationale that, because the trial justice did not assess that particular theory of liability when ruling on plaintiff's motion for a new trial, this Court does not have the benefit of understanding why the trial justice found that "liability and proximate cause [were] completely interwoven" in this case. Therefore, "the trial justice failed to reference enough evidence for this Court to be satisfied that [she] applied the correct standard." *King v. Huntress, Inc.*, 94 A.3d 467, 493 (R.I. 2014).

I write separately, however, because it is my opinion that plaintiff should not bear the burden for any error that the trial justice may or may not have made when she decided the motion for a new trial. Although there may have been a sufficient record to support a finding of negligence without proximate cause, the trial justice also may have been well within her discretion to reject that theory, and it is not the function of this Court to make those determinations that are more properly suited to the trial justice. *See Gomes v. Rosario*, 79 A.3d 1262, 1267 (R.I. 2013) ("This Court, reading an inanimate transcript, is not well positioned to weigh evidence or determine credibility."); *State v. Lynch*, 854 A.2d 1022, 1033 (R.I. 2004) ("The trial

justice enjoys a ringside seat at the trial[.]") (brackets omitted) (quoting *State v. Werner*, 830 A.2d 1107, 1113 (R.I. 2003)).

The plaintiff "may or may not be entitled to a new trial." *Cappuccilli v. Carcieri*, 174 A.3d 722, 740 (R.I. 2017) (Goldberg, J., concurring and dissenting). "The plaintiff is however, deserving of a decision, after a rehearing," *id.*, that addresses the multiple theories of liability that the plaintiff introduced at trial so that this Court may be satisfied that the trial justice "applied the correct standard." *King*, 94 A.3d at 493; *see State v. Golembewski*, 808 A.2d 622, 625-26 (R.I. 2002) (case remanded to Superior Court for rehearing on motion for a new trial because trial justice failed to "set out in some reasonable manner the material factual evidence[,] * * * direct or circumstantial, upon which [the trial justice's] ruling [was] based").

I therefore dissent from the holding of the majority in this case that vacates the order of the Superior Court and remands the case with instructions to reinstate the jury's verdict. I would instead remand this case to the Superior Court for a rehearing on the plaintiff's motion for a new trial, with instructions to the trial justice to both consider the plaintiff's multiple theories of liability and whether there was sufficient evidence of causation presented by the plaintiff under each theory of liability.

- 23 -



# STATE OF RHODE ISLAND

## SUPREME COURT – CLERK'S OFFICE
Licht Judicial Complex
250 Benefit Street
Providence, RI  02903

## OPINION COVER SHEET

| | |
|---|---|
| **Title of Case** | Pamela Joplin, Individually and in her capacity as Executrix of the Estate of Patricia A. Kinney, et al v. Kathleen A. Cassin M.D. |
| **Case Number** | No. 2018-242-Appeal. (WC 13-384) |
| **Date Opinion Filed** | June 9, 2021 |
| **Justices** | Suttell, C.J., Flaherty, and Robinson, JJ. |
| **Written By** | Chief Justice Paul A. Suttell |
| **Source of Appeal** | Washington County Superior Court |
| **Judicial Officer from Lower Court** | Associate Justice Sarah Taft-Carter |
| **Attorney(s) on Appeal** | For Plaintiff:<br><br>Michael P. Quinn, Jr., Esq.<br>Timothy J. Grimes, Esq. |
| | For Defendant:<br><br>Derek M. Gillis, Esq.<br>Francis A. Connor, III, Esq. |